707 F.2d 680
 41 UCC Rep.Serv. 912
 VOEST-ALPINE INTERNATIONAL CORPORATION, Plaintiff-Appellant,
Cross-Appellee,
v.
The CHASE MANHATTAN BANK, N.A., Defendant-Appellee, Cross-Appellant,
v.
BANK OF BARODA, Third-Party Defendant, Cross-Appellee.
 No. 703, Dockets 82-7679, 82-7681.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 13, 1983.
Decided May 12, 1983.
 
 Christopher F. Meatto, New York City (Andrew Berger, Stanley T. Stairs, Breed, Stairs & Berger, New York City, of counsel), for plaintiff-appellant, cross-appellee.
 Andrew J. Connick, New York City (Eugene F. Farabaugh, Scott H. Wyner, Milbank, Tweed, Hadley & McCloy, New York City, of counsel), for defendant-appellee, cross-appellant.
 Robert A. Jaffe, New York City (Thomas W. Evans, Shari J. Levitan, Mudge, Rose, Guthrie & Alexander, New York City, of counsel), for third-party defendant, cross-appellee.
 Before FEINBERG, Chief Judge, CARDAMONE and DAVIS*, Circuit Judges.
 CARDAMONE, Circuit Judge:
 
 
 1
 This appeal involves an interpretation of the law applied to commercial letters of credit. When analyzing that law the unique characteristics of a letter of credit must be kept firmly in mind. Otherwise, a court may unknowingly paint broadly over the letter of credit's salient features and compromise its reliability and fluidity.
 
 BACKGROUND
 
 2
 Originally devised to function in international trade, a letter of credit reduced the risk of nonpayment in cases where credit was extended to strangers in distant places. Interposing a known and solvent institution's (usually a bank's) credit for that of a foreign buyer in a sale of goods transaction accomplished this objective. See Joseph, Letters of Credit: The Developing Concepts and Financing Functions, 94 Banking L.J. 816, 816-17 (1977) (Letters of Credit: Developing Concepts ). A typical letter of credit transaction, as the case before us illustrates, involves three separate and independent relationships--an underlying sale of goods contract between buyer and seller, an agreement between a bank and its customer (buyer) in which the bank undertakes to issue a letter of credit, and the bank's resulting engagement to pay the beneficiary (seller) providing that certain documents presented to the bank conform with the terms and conditions of the credit issued on its customer's behalf. Significantly, the bank's payment obligation to the beneficiary is primary, direct and completely independent of any claims which may arise in the underlying sale of goods transaction.
 
 
 3
 Several distinct features characterize letters of credit. By conditioning payment solely upon the terms set forth in the letter of credit, the justifications for an issuing bank's refusal to honor the credit are severely restricted, thereby assuring the reliability of letters of credit as a payment mechanism. Banks readily issue these instruments because they are simple in form. Hence, they are convenient and economical for a customer (buyer) to obtain. Further, employing concepts which underlie letters of credit in non-sale of goods transactions enables these devices to serve a financing function, see Letters of Credit: Developing Concepts at 818-19. And it is this flexibility that makes letters of credit adaptable to a broad range of commercial uses. See id. at 820-51; Note, Judicial Development of Letters of Credit Law: A Reappraisal, 66 Cornell L.Rev. 144, 146-47 (1980) (Judicial Development of Letters of Credit Law ).
 
 
 4
 Letters of credit evolved as a mercantile specialty entirely separate from common law contract concepts and they must still be viewed as entities unto themselves. Completely absorbed into the English common law by the 1700s along with the Law Merchant--of which it had become an integral part by the year 1200--2 W. Holdsworth, A History of English Law 570-72 (1922), letter of credit law found its way into American jurisprudence where it flourishes today. Its origins may be traced even more deeply into history. There is evidence letters of credit were used by bankers in Renaissance Europe, Imperial Rome, ancient Greece, Phoenicia and even early Egypt. See Trimble, The Law Merchant and The Letter of Credit, 61 Harv.L.Rev. 981, 982-85 (1948). These simple instruments survived despite their nearly 3000-year-old lineage because of their inherent reliability, convenience, economy and flexibility.
 
 
 5
 Since the great utility of letters of credit arises from the independent obligation of the issuing bank, attempts to avoid payment premised on extrinsic considerations--contrary to the instruments' formal documentary nature--tend to compromise their chief virtue of predictable reliability as a payment mechanism. See Judicial Development of Letters of Credit Law at 160; Justice, Letters of Credit: Expectations and Frustrations--Part 2, 94 Banking L.J. 493, 505-06 (1977). Viewed in this light it becomes clear that the doctrine of strict compliance with the terms of the letter of credit functions to protect the bank which carries the absolute obligation to pay the beneficiary. Adherence to this rule ensures that banks, dealing only in documents, will be able to act quickly, enhancing the letter of credit's fluidity. Literal compliance with the credit therefore is also essential so as not to impose an obligation upon the bank that it did not undertake and so as not to jeopardize the bank's right to indemnity from its customer. Documents nearly the same as those required are not good enough. See H. Harfield, Letters of Credit 51 (1979). See generally Marino Industries v. Chase Manhattan Bank, N.A., 686 F.2d 112, 114-15 (2d Cir.1982); Venizelos, S.A. v. Chase Manhattan Bank, 425 F.2d 461, 464-65 (2d Cir.1970).
 
 
 6
 We note that there is a distinction between rights obtained and obligations assumed under letter of credit concepts. While a party may not unilaterally alter its obligations, nothing in the purpose or function of letters of credit forecloses the party from giving up its rights.
 
 FACTS
 
 7
 Metal Scrap Trading Corporation (MSTC) is an agency of the Indian government that had contracted to buy 7000 tons of scrap steel from Voest-Alpine International Corporation (Voest), a trading subsidiary of an Austrian company. In late 1980 MSTC asked the Bank of Baroda to issue two letters of credit in the total amount of $1,415,550--one for $810,600 and the other $604,950--to Voest to assure payment for the sale. The credits were expressly made subject to the Uniform Customs and Practice for Documentary Credits.
 
 
 8
 The parties originally contemplated that Chase Manhattan Bank, N.A. (Chase or Bank) would serve as an advising bank in the transaction. As such, Chase was to review documents submitted by Voest in connection with its drafts for payment. Amendments to the letters of credit increased Chase's responsibilities and changed its status to that of a confirming bank, independently obligated on the credit to the extent of its confirmation.
 
 
 9
 The contract between MSTC and Voest provided that Voest, as seller, would ship the scrap metal no later than January 31, 1981. The terms and conditions of the credits required proof of shipment, evidenced by clean-on-board bills of lading; certificates of inspection indicating date of shipment; and weight certificates issued by an independent inspector. Sometime between February 2 and February 6 (beyond the January 31 deadline), the cargo was partially loaded aboard the M.V. ATRA at New Haven. Unfortunately, the ATRA never set sail for India. A mutiny by the ship's crew disabled the ship and rendered it unseaworthy. The scrap steel was later sold to another buyer for slightly over a half million dollars, nearly a million dollars less than the original contract price.
 
 
 10
 On February 13, two days before the expiration date of the credits, Voest presented three drafts with the required documentation to Chase. The documents contained what the district court termed "irreconcilable" inconsistencies. The bills of lading indicating receipt on board of the scrap metal were signed and dated January 31 by the captain of the ATRA. The weight and inspection certificates accompanying the drafts revealed, however, that the cargo was loaded aboard the ATRA sometime between February 2 and February 6.
 
 
 11
 Despite this glaring discrepancy Chase advised the Bank of Baroda on February 25 that the drafts and documents presented to it by Voest conformed to the terms and conditions set forth in the letters of credit. At Voest's request (Chase having provided Voest with an advance copy of the advice it planned to forward to the Bank of Baroda), Chase added the following language: "PAYMENT OF ABOVE-MENTIONED DRAFT ... WILL BE MADE AT MATURITY ON JULY 30, 1981, TO VOEST...." The Bank of Baroda apparently looked at the documents with more care than Chase. It promptly advised Chase that the documents did not comply with the requirements of the letters of credit, that it would therefore not honor the drafts, and that it would hold the documents at Chase's disposal. When Voest presented the drafts for payment on July 30 Chase refused to honor them.
 
 
 12
 Voest thereupon instituted the present suit. It asserted that Chase waived the right to demand strict compliance with the terms of the credits and therefore wrongfully dishonored the drafts. Voest further alleged that regardless of whether the documents conformed to the letters of credit Chase was liable on the drafts because it accepted them. Chase, in turn, served a third-party complaint on the Bank of Baroda, alleging that were Chase to be held liable for wrongfully dishonoring the drafts, the Bank of Baroda should be liable to Chase in the same amount. In granting summary judgment against Voest the United States District Court for the Southern District of New York (Duffy, J.), 545 F.Supp. 301, found that Chase had not waived compliance with the terms and conditions of the letters of credit and that the drafts had not been wrongfully dishonored. The district court also rejected Chase's affirmative defense that Voest committed fraud in presenting documents which contained such obvious discrepancies. Voest has appealed from the order insofar as it granted summary judgment against it and Chase has cross-appealed from that part of the order which dismissed its third-party complaint against the Bank of Baroda.
 
 DISCUSSION
 I. Waiver
 
 13
 Voest urges that summary judgment was inappropriate because there were disputed factual issues as to whether Chase accepted the documents submitted and, if so, thereby waived any deficiencies in them. Chase contends that a waiver analysis is inappropriate because the defects in Voest's documentation were "incurable." In urging that such defects preclude any waiver on its part, Chase relies upon Flagship Cruises Ltd. v. New England Merchants National Bank of Boston, 569 F.2d 699 (1st Cir.1978) and American Employers Insurance Co. v. Pioneer Bank and Trust Co., 538 F.Supp. 1354 (N.D.Ill.1981). These cases afford the Bank little comfort. In neither case was there any indication that the issuing or confirming bank accepted defective or untimely documents.
 
 
 14
 Two other cases including a decision of this Court have indicated that the terms and conditions of a letter of credit may be waived. In Marino Industries Corp. v. Chase Manhattan Bank, N.A., 686 F.2d at 117, one of the questions raised was whether an official of Chase, with apparent authority to act, had waived the expiration date of a letter of credit. Since that issue had not been resolved by the trial court the case was remanded for further consideration. By remanding on the waiver issue, the Marino court impliedly approved a waiver analysis even though it reaffirmed its adherence to the rule of strict compliance expressed in Venizelos, S.A., 425 F.2d at 465. Moreover, the Court apparently recognized that a confirming bank may waive the requirements contained in the credit without approval of either the issuing bank or its customer who originally established the credit. Id. In the instant case Chase could have waived the right to demand strict compliance without approval from either the Bank of Baroda or MSTC.
 
 
 15
 In Chase Manhattan Bank v. Equibank, 550 F.2d 882 (3d Cir.1977), Chase, as beneficiary of a letter of credit, contended that its untimely presentation of documents resulted from an agreement with the issuing bank (Equibank) to extend the time beyond that specified in the credit. The Third Circuit held that the possibility of a waiver of the time requirement by Equibank existed. The court stated that in such instances the "beneficiary bases his claim on the letter of credit as modified by the bank and acceptable to him." Equibank, 550 F.2d at 886. The court noted that such a waiver merely jeopardizes a bank's right to reimbursement from its customer, in the case of an issuing bank, see Courtaulds North American, Inc. v. North Carolina National Bank, 528 F.2d 802, 806 (4th Cir.1975), or from the issuing bank, in the case of a confirming bank. Id. at 886-87 & n. 6.
 
 
 16
 Chase argues that Equibank is distinguishable because in that case the defects were arguably curable while in the present case they are not. Chase contends that incurability of defect defeats any possibility of waiver. We reject this argument because it is totally at odds with the concept of waiver, which is defined as the intentional relinquishment of a known right. Whether or not a defect can be cured is irrelevant, for it is the right to demand an absence of defects that the party is deemed to have relinquished.
 
 
 17
 Since a waiver by Chase of the inconsistencies in the documents is possible, we must determine whether Voest presented sufficient evidence which, if believed, could establish a waiver. As proof of waiver Voest relies most heavily on deposition testimony by the Chase official who inspected the documents that he "must have noticed" the discrepancy between the dates in the documents. Other evidence of waiver included: an initialed approval of the documents by a Chase official on the Voest letter which accompanied the presentation of the documents; a letter from Voest to Bank of Baroda, allegedly co-authored by a Chase official, stating that the documents had been accepted; the statement which appeared at the bottom of Chase's advice to Bank of Baroda that payment of the draft would occur on July 30; and a deposition by a Voest official in which he quotes an unknown Chase employee as stating that Chase had accepted the drafts and that payment would definitely be forthcoming.
 
 
 18
 All parties seem to agree that New York law governs. To establish waiver under New York law one must show that the party charged with waiver relinquished a right with both knowledge of the existence of the right and an intention to relinquish it. See City of New York v. State of New York, 40 N.Y.2d 659, 669, 389 N.Y.S.2d 332, 357 N.E.2d 988 (1976); Werking v. Amity Estates, Inc., 2 N.Y.2d 43, 52, 155 N.Y.S.2d 633, 137 N.E.2d 321 (1956), cert. denied, 353 U.S. 933, 77 S.Ct. 812, 1 L.Ed.2d 756 (1957). There is little doubt that Voest sufficiently established Chase's knowledge of an existing right. Chase clearly had the right to demand strict compliance with the specifications required by the letters of credit, and since it is an established commercial bank we may assume that it had constructive, if not actual, knowledge of that right, see Barry-Dorn, Inc. v. Texaco, Inc., No. 74 Civ. 5526 (S.D.N.Y. October 30, 1978) (constructive knowledge of right sufficient), aff'd, 607 F.2d 994 (2d Cir.1979); Zeldman v. Mutual Life Insurance Co. of New York, 269 A.D. 53, 53 N.Y.S.2d 792 (1st Dep't 1945) (same). The remaining question is whether that right had been intentionally relinquished.
 
 
 19
 The intention to relinquish a right may be established either as a matter of law or fact. Examples of the former include instances of express declarations by a party or situations where the party's undisputed acts or language are "so inconsistent with his purpose to stand upon his rights as to leave no opportunity for a reasonable inference to the contrary." Alsens American Portland Cement Works v. Degnon Contracting Co., 222 N.Y. 34, 37, 118 N.E. 210 (1917). More commonly, intention is proved through declarations, acts and nonfeasance which permit different inferences to be drawn and "do not directly, unmistakably or unequivocally establish it." Id. In these instances intent is properly left to the trier of fact. See id.; Sillman v. Twentieth Century Fox, 3 N.Y.2d 395, 403, 165 N.Y.S.2d 498, 144 N.E.2d 387 (1957); see, e.g., Barry-Dorn, Inc. v. Texaco, Inc., supra.
 
 
 20
 Claims by a beneficiary of a letter of credit that a bank has waived strict compliance with the terms of the credit should generally be viewed with a somewhat wary eye. As noted earlier, if equitable waiver claims are treated too hospitably by courts, letters of credit may become less useful payment devices because of the increased risk of forfeiting the right to reimbursement from their customers which banks would soon face. Nonetheless, because Voest offered evidence which, if believed by the trier of fact, could establish the requisite intentional relinquishment of Chase's right to insist on strict compliance, summary judgment was inappropriately granted to Chase in this case.
 
 II. Acceptance
 
 21
 Having discussed Voest's claim that Chase waived strict compliance, we turn to Voest's contention that Chase "accepted" the drafts drawn under the letters of credit. The issue is specifically addressed by Uniform Commercial Code (U.C.C.) Sec. 3-410. This section states that acceptance is the drawee's signed engagement to honor the draft as presented and that it "must be written on the draft." The official comment acknowledges that Sec. 3-410 was intended to eliminate "virtual" acceptances by written promise to accept a draft still to be drawn and "collateral" acceptances proved by separate writing. By requiring written acceptance on the draft the U.C.C. impliedly eliminated oral acceptances as well. Id. The present record is silent as to whether Chase actually accepted the drafts by proper notation on them. Since this issue was not ruled on by the district court, it should be remanded for further consideration.
 
 III. Fraud
 
 22
 Presentation of fraudulent documents to a bank by a beneficiary subverts not only the purposes which letters of credit are designed to serve in general, but also the entire transaction at hand in particular. Falsified documents are the same as no documents at all. See Old Colony Trust Co. v. Lawyers' Title & Trust Co., 297 F. 152, 158 (2d Cir.), cert. denied, 265 U.S. 585, 44 S.Ct. 459, 68 L.Ed. 1192 (1924); Prutscher v. Fidelity International Bank, 502 F.Supp. 535 (S.D.N.Y.1980). We are not persuaded upon the present record, as was the trial court, that Voest did not intend to deceive Chase when it submitted deliberately backdated documents falsely indicating compliance with the terms of the credits in order to have the documents accepted. Since Chase has raised a sufficient question of fact regarding fraud, a trial of this issue is mandated. If it is found that fraud on the part of Voest caused Chase to act, then Voest would be estopped from claiming any benefit accruing to it from its misconduct.
 
 IV. Chase's Cross-Appeal
 
 23
 Finally, we affirm the judgment in favor of the Bank of Baroda. All parties have acknowledged that the documents tendered Chase did not conform to the established terms and conditions of the letters of credit. The Bank of Baroda, as the issuing bank, was entitled to strict compliance and there is no claim that it waived that right. Further, Chase itself has acknowledged that its cross-appeal has been rendered academic in light of Voest's admission regarding the nonconformity of the documents.
 
 CONCLUSION
 
 24
 This case must be remanded to determine the factual issues raised by the claims of waiver, acceptance and fraud. The order appealed from is thus affirmed in part, reversed in part and remanded for further proceedings in accordance with this opinion.
 
 
 
 *
 Honorable Oscar H. Davis, United States Circuit Judge, United States Court of Appeals for the Federal Circuit, sitting by designation