BANQUE WORMS, NEW YORK
BRANCH, Plaintiff,

v.

BANQUE COMMERCIALE PRIVEE,
Irving Trust Company, Defendant
and Third-Party Plaintiff,

v.

Stephen R. WALSH, individually and as general partner of Peachtree Lakes Assoc., & general partner of Ashley Run Assoc., etc., & General Electric Real Estate Equities, Inc. etc., & Walsh International Inc., & Cherokee Construction Co., Inc., Third-Party Defendants.

No. 86 Civ. 8940 (WCC).

United States District Court,
S.D. New York.

Feb. 11, 1988.

As Amended Feb. 24, 1988.

Schwalb, Donnenfeld, Bray & Silbert, Washington, D.C., Stillman, Friedman & Shaw, New York City, for third-party plaintiff; Charles R. Donnenfeld, Philip D. Green, Lucinda J. Bach, Washington, D.C., Julian Friedman, Andrew Kaizer, New York City, of counsel.

Breed, Abbott & Morgan, New York City, for third-party defendant Gen. Elec. Real Estate Equities, Inc.; James J. Sabella, of counsel.

Winthrop, Stinson, Putnam & Roberts, New York City, for defendant Irving Trust Co.; Stephen A. Weiner, of counsel.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge.

This dispute arises out of a complex commercial transaction involving the development of a parcel of real estate in Georgia. As part of this transaction, de-

fendant Irving Trust Company ("Irving") made several loans to Stephen R. Walsh, third party defendant herein. To secure a part of these loans, Walsh obtained a letter of credit from Banque Commerciale Privee ("BCP"), defendant and third-party plaintiff herein, in favor of Irving. Banque Worms, New York Branch, acted as confirming bank. When Irving attempted to draw on the letter of credit, BCP advised Banque Worms not to pay. Banque Worms refused to honor the credit, and brought the present action for interpleader pursuant to 28 U.S.C. § 1335, paying the $3,600,000 at issue into the registry of the Court. Irving counterclaimed against Banque Worms for payment of the letter of credit, and BCP cross-claimed against Irving. BCP also asserted third-party claims against Walsh, General Electric Real Estate Equities ("GEREE"), and several corporations and partnerships under Walsh's control ("the Walsh entities").

Irving now moves pursuant to Rule 56(a), Fed.R.Civ.P., for an order granting summary judgment on its counterclaim. For the reasons set forth below, the motion is granted.

## I. *Facts*

In the Summer of 1983, Walsh, a North Carolina developer, asked BCP to assist him in acquiring approximately seventy-seven acres of land near Atlanta, Georgia, known as Peachtree Lakes. As security for Irving's $2,595,300 loan to the Cherokee Construction Company of Charlotte, Inc. ("Cherokee"), a corporation under Walsh's control, BCP issued a letter of credit in the same amount in favor of Irving and confirmed by Banque Worms. Walsh and Irving drafted the text of the letter of credit.[1] As further security for the loan, The Walsh Corporation executed a "Deed to Secure Debt and Security Agreement" conveying a tract of land known as Phase II of Peachtree Lakes to Irving.

Sometime in the fall of 1983, Walsh initiated discussions with BCP concerning the development of an apartment complex known as Ashley Run on the Phase II parcel. BCP agreed to increase the letter of credit in favor of Irving, the construction lender on the Ashley Run project, to $3.6 million as security for a corresponding increase in Irving's loan to Walsh.

On April 27, 1984, Walsh, on behalf of Walsh International, Inc., and Cherokee, entered into a loan agreement with BCP setting forth the terms and conditions under which BCP would issue and fund the increased letter of credit. Pursuant to the agreement, the letter of credit was to be paid and funded only upon lien-free completion of the Ashley Run apartment complex. Walsh and BCP further agreed that upon funding of the letter of credit, BCP's loan to Walsh would be secured by a mortgage on the Ashley Run property. When BCP executed the loan agreement, BCP believed that Walsh or one of the corporations he

---

1. On August 18, 1983, Banque Worms sent a telex to Irving informing irving that Banque Commerciale Privee opened their irrevocable letter of credit in Irving's favor. The telex setforth the text of the letter of credit as follows:
   QUOTE
   WE HEREBY ESTABLISH OUR IRREVOCABLE L/C I FAVOUR OF IRVING TR CO N.Y. FOR THE A/C OF CHEROKEE CONSTRUCTION CO. INC. FOR A SUM NOT EXCEEDING USDLS 2,595,300.00 (TWO MILLION FIVE HUNDRED NINETY FIVE THOUSAND THREE HUNDRED AND NO./100).
   WE HEREBY GUARANTEE UNCONDITIONALLY AND IRREVOCABLY TO PAY UPON FIRST DEMAND AGAINST YOUR DRAFT AT SIGHT DRAWN ON BANQUE COMMERCIALE PRIVEE, 89 RUE DU FAUBOURG ST HONORE, 75008 PARIS, FRANCE BEARING THE EXPIRATION DATE OF L/C: OCT. 15, 1983.
   WE HEREBY ENGAGE WITH THE BONA FIDE HOLDERS OF ALL DRAFTS DRAWN UNDER AND IN COMPLIANCE WITH THE TERMS OF THIS L/C THAT SUCH DRAFTS WILL BE DULY HONORED UPON PRESENTATION TO US.
   THIS L/C IS SUBJECT TO THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY L/C'S (1974 REVISION) INTL CHAMBER OF COMMERCE PUBLICATION NO. 290.
   UNQUOTE
   WE CONFIRM THIS CREDIT AND THEREOF UNDERTAKE THAT ALL DRAFTS DRAWN AND PRESENTED AS ABOVE SPECIFIED WILL BE DULY HONORED BY US. OUR REFERENCE NO. 10136–CF TO BE SHOWN ON ALL THE DOCUMENTS.
   Kennedy Support Aff., Exhibit C.

controlled was the owner of record of the Ashley Run tract. Walsh represented in the loan agreement that Walsh International and Cherokee would acquire and continue to hold title to the property. Irving was not a party to the loan agreement. In addition to the loan agreement, Walsh International and Cherokee entered into separate letter agreements with BCP and certain other participants, under which BCP and the other participants became entitled to fifty percent of all net profits and net sales proceeds derived from the Ashley Run project, as well as preferences in the distribution of the proceeds from any conveyance of the Ashley Run property.

After executing the loan agreement, BCP asked Walsh to provide the text to be included in the $3.6 million letter of credit. By telex dated April 17, 1984, Walsh advised BCP that he would be working with Irving to develop the language. On April 23, 1984, Walsh sent a telex to BCP with the following instructions:

> The text of the Letter of Credit should be identical to the text of the $2.595 Letter of Credit now being held by Irving Trust with the following changes and additions:
>
> (1) The amount of the credit is $3.6 Million U.S.D.
>
> (2) The expiration date of the new Letter of Credit should be June 1, 1985.
>
> (3) The following language should be added to the text as an additional paragraph:

2. Additional amendments subsequently were made to the letter of credit. These amendments, however, are not material to the outcome of this motion. As a consequence of the amendments to the letter of credit, the final text of the letter of credit, as set forth in telexes to Irving from Banque Worms, is as follows:

> TO BE EFFECTIVE MAY 31, 1984 AT THE REQUEST OF BANQUE COMMERCIALE PRIVEE, PARIS
> WE ADVISE DETAILS OF THEIR L/C NO. 890 OUR 10316-C B/O CHEROKEE CONSTRUCTION COMPANY INC. AND WALSH INTL, INC. IN YOUR FAVOR FOR USD 3,600,000.00 AS FOLLOWS:
> QUOTE:
> THE PURPOSE OF THIS LETTER OF CREDIT IS TO PROVIDE FOR EQUITY FUNDING FOR THE PEACHTREE LAKES PROJECT

> 'The purpose of this Letter of Credit is to provide for equity funding for the Peachtree Lakes Project.'

Vuillieme Opposition Aff., Exhibit C.

Thereafter, on May 7, 1984, BCP sent a telex to Banque Worms setting forth the terms of BCP's letter of credit number 890 in Irving's favor in the amount of $3,600,000. The letter contained the purpose clause that Walsh had requested. In addition, it stated that the letter was "subject to performance of all terms and conditions contained in the loan agreement entered into on the 27TH OF APRIL 1984 between ourselves [BCP] and the above companies [Cherokee and Walsh International]." Vuillieme Opposition Aff., Exhibit D. It also contained a clause making the letter of credit subject to the Uniform Customs and Practice For Documentary Letter of Credit (1974 Revision), International Chamber of Commerce Publication No. 290. Banque Worms confirmed the letter of credit by telex on May 30, 1984, giving it the reference number 10316-C.

By telexes dated June 5, 1984, and June 8, 1984, Banque Worms advised Irving of an amendment that BCP had proposed, providing for deletion of the language making BCP's funding obligation subject to performance of all terms and conditions contained in the loan agreement. On June 11, 1984, Irving advised Banque Worms that it accepted BCP's letter of credit No. 890 and Banque Worms letter of credit No. 10316-C as amended.[2] Neither Walsh nor Cherokee, however, agreed to the amendment.

> WE HEREBY GUARANTEE UNCONDITIONALLY AND IRREVOCABLY TO PAY UPON FIRST DEMAND AGAINST YOUR DRAFT AT SIGHT DRAWN ON BANQUE COMMERCIALE PRIVEEE, 89/90 RUE DU FAUBOURG ST HONORE–75008 PARIS, FRANCE, BEARING THE CLAUSE "DRAWN UNDER DOCUMENTARY LETTER OF CREDIT NUMBER 890', ANY AMOUNT(S) DUE TO IRVING TRUST CO.–NEW YORK UP TO AND INCLUDING USD 3,600,000
> EXPIRATION DATE OF LETTER OF CREDIT: DECEMBER 6, 1986
> WE HEREBY ENGAGE WITH THE BONA FIDE HOLDERS OF ALL DRAFTS DRAWN UNDER AND IN COMPLIANCE WITH THE TERMS OF THIS LETTER OF CREDIT THAT SUCH DRAFTS WILL BE DULY HONORED UPON PRESENTATION TO US

On May 24, 1984, Walsh and Irving amended the "Deed to Secure Debt and Security Agreement" to increase the indebtedness to $3,600,000. Irving released the security deed on August 29, 1984 by executing a warranty deed in favor of Peachtree Lakes Associates, a North Carolina limited partnership, acknowledging payment in full of the obligation secured. On that same day, The Walsh Corporation conveyed Phase II of the Peachtree Lakes tract to Peachtree Lakes Associates, and Peachtree Lakes Associates then gave Irving a security interest in the Phase II tract. Stephen Walsh and his wife Paula are the sole partners in Peachtree Lakes Associates.

Also on August 29, 1984, Peachtree Lakes Associates and GEREE entered into a partnership agreement to form Ashley Run Associates, a Georgia general partnership. Under the partnership agreement, GEREE made a capital contribution of $2.9 million, and thereby became entitled to a 50% ownership interest in the Ashley Run Project, as well as preferences in the distribution of cash flow and net sales proceeds. Peachtree Lakes Associates then executed a sales contract under which it agreed to convey the Phase II tract to Ashley Run Associates. This conveyance was effected by warranty deed dated February 27, 1986. Ashley Run Associates then gave a security interest in Phase II of the Peachtree Lakes tract to the General Electric Credit Corporation ("GECC") as security for GECC's loan in the amount of $10,910,000.

Irving was actively involved in these transactions. As a condition precedent to closing its construction loan, Irving demanded assurance that the GEREE equity contribution and the GECC permanent loan would be consummated. Irving's construction loan agreement with Peachtree Lakes Associates was executed on the same day as the General Electric agreements and makes numerous references to those agreements. The construction loan agreement makes no reference to BCP's rights in the Ashley Run project. BCP did not learn of these transactions until 1986.

By letter dated November 10, 1986 and received on November 12, 1986, Irving presented to Banque Worms its sight draft, dated November 10, 1986, in the amount of $3,600,000. The draft was drawn on BCP and bore the clause "DRAWN UNDER DOCUMENTARY LETTER OF CREDIT NUMBER 890." Irving requested payment by Banque Worms pursuant to the terms of the letter of credit. On November 18, 1986, counsel for Banque Worms wrote to Irving, enclosing a copy of a letter from counsel for BCP to Banque Worms. In these letters BCP and Banque Worms took the position that Irving was not entitled to payment of the draft because of the provision in the letter of credit making payment subject to performance of all terms and conditions contained in the April 27, 1984 loan agreement between BCP, Cherokee, and Walsh International. Irving's counsel responded by letter dated November 17, 1986, that the letter of credit had been amended to delete the reference to the April 27, 1984 agreement on which Banque Worms and BCP were relying. Thereafter, on November 19, 1986, Irving received a letter from counsel for Banque Worms requesting a written statement from Irving that the purpose clause of the letter of credit had been met and that the proceeds of the letter of credit were used for the stated purpose. By letter dated November 20, 1986, Irving's counsel responded to Banque Worms, pointing out that the position taken by Banque Worms was contrary to the provisions of the letter of credit, and inconsistent with the immediate and unconditional obligation of Banque Worms to

THIS LETTER OF CREDIT IS SUBJECT TO THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY LETTER OF CREDIT (1974 REVISION) INTERNATIONAL CHAMBER OF COMMERCE PUBLICATION NO. 290 UNQUOTE STOP
WE CONFIRM THIS CREDIT AND THEREBY UNDERTAKE THAT ALL DRAFTS DRAWN UNDER AND IN COMPLIANCE WITH THE TERMS OF THE ORIGINAL CREDIT (AND ANY FURTHER CONDITIONS STIPULATED HEREIN) WILL BE DULY HONORED ON PRESENTATION AT OUR OFFICE FOR NEGOTIATION STOP"

make payment. Irving renewed its demand for payment.

On November 20, 1986, Banque Worms commenced this interpleader action against Irving and BCP, and paid the $3,600,000 at issue into the registry of the Court. Irving asserts that the loans that the letter of credit was intended to secure have not been repaid, and has submitted documents and affidavits in support of this assertion. BCP, however, claims that the loans have been paid in full, and has submitted documents in support of its contention.

## II. *Discussion*

Actions concerning letters of credit are well suited to determination by motion for summary judgment because they normally present solely legal issues relating to an exchange of documents. *See Bank of Cochin Ltd. v. Manufacturers Hanover Trust Co.,* 612 F.Supp. 1533, 1537 (S.D.N.Y.1985), *aff'd,* 808 F.2d 209 (2d Cir.1986); *Data General Corp. v. Citizens National Bank,* 502 F.Supp. 776, 779 (D.Conn.1980); *West Virginia Housing Development Fund v. Sroka,* 415 F.Supp. 1107, 1110 (W.D.Pa.1976); *see also Transamerica Delaval Inc. v. Citibank, N.A.,* 545 F.Supp. 200, 203 (S.D.N.Y.1982) (letter of credit disputes usually present legal issues relating to an exchange of documents rather than questions of fact). Nevertheless, even in a letter of credit case summary judgment is inappropriate when there are genuine issues of material fact. *See* Fed.R.Civ.P. 56(c).

Irving asserts that the following facts are not subject to dispute. Under the terms of BCP's letter of credit, the only condition to Irving's right to payment was presentation of a conforming draft to Banque Worms. Irving presented a conforming draft, but, at BCP's request, Banque Worms refused to pay.

■ To draw on a letter of credit, the beneficiary need only establish that it has strictly complied with its essential requirements. *Marino Industries Corp. v. Chase Manhattan Bank, N.A.,* 686 F.2d 112, 114 (2d Cir.1982). If the undisputed facts are as Irving asserts, Irving was in strict compliance with the terms of the letter of credit, and therefore is entitled to judgment as a matter of law.

BCP opposes Irving's motion on three grounds. First, BCP contends that the consent of its customers, Walsh International and Cherokee, was necessary to amend the letter of credit. Since BCP's customers never agreed to delete the language conditioning payment under the credit on the performance of all terms and conditions contained in the loan agreement, BCP contends that the amendment to that effect was a nullity. Accordingly, BCP concludes that its obligation to pay never matured because Cherokee and Walsh International did not perform under the loan agreement. Second, BCP asserts that the purpose clause required Irving, as a condition precedent to its right to payment, to certify that the proceeds of the letter of credit were to be used for equity funding for the Peachtree Lakes project. BCP contends that this construction of the purpose clause presents factual issues precluding summary judgment. Third, BCP argues that its allegations of fraud in the transaction raise genuine issues of material fact precluding summary judgment.[3]

### A. Amendment of the Letter of Credit

Irving does not dispute BCP's assertion that Walsh International and Cherokee neither consented to the amendment nor performed their obligations under the loan agreement. Therefore, there being no disputed facts as to the validity of the amendment, this is a question of law that may be decided on a motion for summary judgment.

By its terms, the letter of credit is subject to the Uniform Customs and Practices

---

**3.** Irving argues that the sole basis on which Banque Worms and BCP initially rejected payment of Irving's draft was the alleged non-compliance with the express condition relating to the April 27, 1984 agreement between BCP and the Walsh entities. Irving contends that BCP has waived its other defenses because it did not assert those defenses when it initially rejected the draft. The Court need not address this argument, however, since, on the merits, the BCP's defenses do not present an obstacle to Irving's motion for summary judgment.

for Documentary Letter of Credit (1974 Revision), International Chamber of Commerce Publication No. 290 ("U.C.P."). The 1974 revision of the U.C.P. states in article 3(c) that an irrevocable credit cannot be amended without the agreement "of all parties thereto." Thus, it might appear that the consent of the issuing bank's customer is required for an amendment.

■ Such a requirement, however, would conflict with the principle that the issuing bank's obligation to honor the beneficiary's drafts against the letter of credit is separate and independent from any obligation of the issuer to its customer. *See Chase Manhattan Bank v. Equibank*, 550 F.2d 882, 886 (3d Cir.1977); *Data General Corp. v. Citizens National Bank*, 502 F.Supp. 776, 788 (D.Conn.1980); *First Commercial Bank v. Gotham Originals, Inc.*, 64 N.Y. 2d 287, 294, 486 N.Y.S.2d 715, 719, 475 N.E.2d 1255, 1259 (1985). This principle, the independence principle, is fundamental to the commercial vitality of letters of credit. *See United States v. Sun Bank of Miami*, 609 F.2d 832, 833 (5th Cir.1980). The independence principle reduces the risk of nonpayment by substituting the reliability and solvency of a known banking institution for that of the customer. *See Voest-Alpine Int'l Corp. v. Chase Manhattan Bank*, 707 F.2d 680, 682 (2d Cir.1983). If the issuing bank, after agreeing to an amendment with the beneficiary, could challenge the validity of the amendment merely on the ground that the issuing bank's customer had not consented, then the issuing bank's obligation to the beneficiary would not be separate and independent of its obligation to its customer. This would undermine the reliability and utility of the letter of credit.

The 1983 revision to the U.C.P. clarified article 3(c) and thereby resolved this conflict. Article 10(d) provides that an irrevocable letter of credit cannot be amended "without the agreement of the issuing bank, the confirming bank (if any) and the beneficiary." Therefore, under the 1983 revision, the customer need not agree to the amendment.

■ BCP argues that the 1983 revision does not apply to the instant action because, by its terms, the letter of credit is subject to the 1974 U.C.P. BCP contends that the 1983 revision represents a change in the U.C.P. rather than a clarification, and therefore is inapplicable to the credit at issue. The official commentary to the U.C.P., however, rejects this notion, and clearly states that the 1983 revision was intended as a clarification of the 1974 revision. International Chamber of Commerce Documentary Credits, *U.C.P. 1974/1983 Revisions Compared and Explained*, 23 (1984, ICC Publication No. 411) (emphasis added). Thus, even under the 1974 revision, the customer's consent is not necessary to amend the letter of credit.

■ BCP also argues that the controlling Second Circuit authority requires the customer's consent to any modification. BCP relies on *KMW Int'l v. Chase Manhattan Bank, N.A.*, 606 F.2d 10, 16 (2d Cir.1979), where the court, relying on article 3(c), stated that the issuing bank's obligation under a letter of credit may not be modified without the consent of both the customer and the beneficiary. In *KMW*, however, there had been no attempt to modify or amend the letter of credit. Consequently, the quoted statement is *dictum*. Moreover, since *KMW* was decided in 1979, the court did not have the benefit of the 1983 clarification to the U.C.P. This Court is confident that when the Second Circuit has an opportunity to consider the 1983 clarification, it will rule that customer consent is not required to amend a letter of credit. *Cf. Voest-Alpine International Corp. v. Chase Manhattan Bank, N.A.*, 707 F.2d 680, 684 (2d Cir.1983) ("a confirming bank may waive the requirements contained in the credit without approval of either the issuing bank or its customer"). In the instant case, therefore, the amendment was effective and Irving's right to payment was not subject to performance of the terms of the loan agreement between BCP and its customers.

## B. The Statement of Purpose Clause

BCP argues that the statment of purpose clause required Irving to certify that the

proceeds of the letter of credit would be used as equity funding for the Peachtree Lakes project. This proposition, however, is contrary to controlling law.

■ New York law and the U.C.P. require strict compliance with all terms and conditions of a letter of credit. *Venizelos, S.A. v. Chase Manhattan Bank,* 425 F.2d 461, 465 (2d Cir.1970); *Bounty Trading Corporation v. S.E.K. Sportswear, Ltd.,* 48 A.D.2d 811, 811, 370 N.Y.S.2d 4, 4 (N.Y. App.Div.1975); U.C.P. article 8(b). Since a beneficiary must strictly comply with the requirements of a letter of credit, it must know precisely and unequivocally what those requirements are. *Marino Industries Corp. v. Chase Manhattan Bank, N.A.,* 686 F.2d at 115. Therefore, "[t]he corollary to the rule of strict compliance is that the requirements in letters of credit must be explicit." *Id.; see Transamerica Delaval v. Citibank, N.A.,* 545 F.Supp. 200 (S.D.N.Y.1982); *International Leather Distributors, Inc. v. Chase Manhattan Bank,* 464 F.Supp. 1197, 1201 (S.D.N.Y.), *aff'd,* 607 F.2d 996 (2d Cir.1979). As stated in Article 14(a) of the U.C.P. (1974 rev.), "All instructions to issue, confirm or advise a credit must state precisely the documents against which payment, acceptance or negotiation is to be made."

■ The clause at issue in this case merely states that the purpose of the letter of credit is to provide equity funding for the Peachtree Lakes project, and does not require that Irving produce any documentation that the funds were used for this purpose. BCP argues, however, that any ambiguities in a letter of credit should be construed most strongly against the drafter. *See United States v. Sun Bank of Miami,* 609 F.2d 832, 833 (5th Cir.1980); *Data General Corp. v. Citizens Nat'l Bank,* 502 F.Supp. 776, 784 (D.Conn.1980); *Republic Nat'l Bank v. Northwest Nat'l Bank,* 578 S.W.2d 109, 115 (Tex.Sup.Ct. 1979). Therefore, BCP asserts that the clause should be construed to require Irving's written confirmation that the proceeds of the letter of credit would be used as equity funding for Peachtree Lakes.

The Court rejects BCP's argument for two reasons. First, the purpose clause is not ambiguous. For a statement to be ambiguous it must be susceptible of two reasonable interpretations. *See Stern v. Satra,* 539 F.2d 1305, 1310 (2d Cir.1976); *City of New York v. Pullman Inc.,* 477 F.Supp. 438 (S.D.N.Y.1979). BCP interprets the clause as requiring Irving to produce a written statement that the letter of credit fund was used to provide equity funding for the Peachtree Lakes project. This, however, is a severely strained interpretation since nowhere does the clause mention any documentation or statement regarding the use of the funds. Therefore, the purpose clause is not susceptible of two reasonable interpretations, and thus, is not ambiguous.

Second, even if the clause were ambiguous, the rule of construction that BCP suggests would undermine the commercial vitality of the letter of credit. As stated above, the requirements in a letter of credit must be explicit. This requirement of explicitness is consistent with the spirit and purpose of letters of credit, which is "to facilitate commercial transactions by allowing the beneficiary to deal freely without fear that payment will be arbitrarily withheld." *United States Steel Corp. v. Chase Manhattan Bank, N.A.,* No. 83–4966 (S.D. N.Y. July 2, 1984) (WCC) [Available on WESTLAW, 1984 WL 598]. The certainty essential to the utility of letters of credit would be seriously compromised if their clear meaning yielded to a consideration of authorship. Although BCP has cited numerous cases which state the principle that ambiguous clauses should be interpreted against the drafter of the letter of credit, neither those cases nor any of which the Court is aware have applied that principle to construe a purpose clause as a documentary precondition to payment. Therefore, the Court declines to interpret the clause against Irving, the drafter. There being no explicit documentary requirement in the purpose clause, the Court refuses to infer one.

### C. Fraud in the Transaction

BCP asserts that Irving has been engaged in a fraud, which, under the doctrine

of fraud in the transaction, justifies BCP's dishonor of the letter of credit.[4] BCP argues that its allegation of fraud in the transaction raises factual issues precluding summary judgment.

■ BCP has submitted affidavits which state that Walsh, through corporate entities under his control, engaged in a series of transactions through which GEREE and GECC acquired interests in the Ashley Run project and the Phase II tract, in conflict with and contrary to BCP's prior loan agreement with Walsh International and Cherokee. BCP's affidavits also assert that Irving was actively involved in these transactions. Specifically, BCP alleges that Irving demanded assurances from GEREE and GECC that they would make loans and capital contributions to Ashley Run Associates. Moreover, BCP has submitted Irving's construction loan agreement with Peachtree Lakes Associates, which makes numerous references to the agreements between Ashley Run, GEREE and GECC.

Irving does not dispute these allegations. Irving contends, however, that BCP cannot prove fraud in the transaction with respect to Irving since Irving attempted to draw on the letter of credit for legitimate purposes only—to obtain payment of the $3,600,000 which they had loaned to Cherokee. BCP has challenged this contention, and has submitted documents which it asserts demonstrate that Irving had recovered its loan before drawing on the letter of credit.

BCP asserts that although Irving's records show an outstanding loan to Cherokee Construction Charleston, the letter of credit secured a loan made to Cherokee Construction Company of Charlotte, Inc. Irving responded with an affidavit by Geraldine Kennedy, a vice-president at Irving, who explained that the discrepancy was a clerical error. Kennedy Supplemental Aff., April 2, 1987, ¶¶ 2–3. Attached as exhibits to Kennedy's affidavit are two documents which demonstrate that the loan was never repaid. Exhibit A refers to the borrower as the Cherokee Construction Company of Charlotte, Inc., and states the customer number as 949104. Exhibit B incorrectly lists the address for Cherokee as Charleston, instead of Charlotte. The customer number on exhibit B, however, is still listed as 949104. This error was carried forward to the documents on which BCP based its assertion that the loan had been repaid. *See* Kennedy Aff., March 20, 1987, Exhs. B & C. Thus, the documents submitted in support of the motion indisputably demonstrate that the loan to Cherokee is still outstanding.

BCP nevertheless adduces the August 29, 1984 quitclaim deed from Irving to Peachtree Lakes Associates as evidence that the loan was repaid. The quitclaim deed recites that the $3.6 million loan to Cherokee had been "repaid in full." Bach Aff., January 22, 1987, Exh. C. BCP overlooks, however, that on the same day that Irving executed the quitclaim deed, Peachtree Lakes Associates gave Irving a security interest in the Phase II tract. It is likely, therefore, despite the recitation that the loan had been repaid in full, that Irving executed the quitclaim deed in exchange for its new security interest in Phase II. Moreover, Irving has submitted the affidavit of Walsh, the President of Cherokee, who states that the loan is still outstanding. Irving's records, Kennedy's affidavits explaining those records, and Walsh's affidavit demonstrate that the statement in the quitclaim deed is merely an erroneous formal recital, and as such is insufficient to

---

4. The doctrine of fraud in the transaction was enunciated in the landmark case of *Sztejn v. Henry Schroder Banking Corp.,* 177 Misc. 719, 31 N.Y.S.2d 631 (Sup.Ct.1941). The court granted an injunction preventing the bank from honoring the seller-beneficiary's draft, stating:

> Where the seller's fraud has been called to the bank's attention before the drafts and documents have been presented for payment the principle of the independence of the bank's obligation under the letter of credit should

not be extended to protect the unscrupulous seller.... Although the bank is not interested in the exact detailed performance of the sales contract, it is vitally interested in assuring itself that there are some goods represented by the documents.

*Id.* at 722–23, 31 N.Y.S.2d at 633–35. The doctrine of fraud in the transaction has been codified in section 5–114(2) of the Uniform Commercial Code.

raise a genuine issue as to the repayment of the loan.

■ BCP further asserts that Irving should have known that the agreements between the Walsh entities, GEREE, and GECC violated BCP's loan agreement with Cherokee and Walsh International. Therefore, BCP concludes that Irving's attempt to draw on the letter of credit constituted fraud in the transaction. The Court cannot endorse this argument, however, because to do so would impose a duty on Irving that both Irving and BCP rejected during their negotiations regarding the language of the credit. In essence, BCP asserts that Irving cannot draw on the credit unless the Walsh entities had performed all the terms and conditions contained in the loan agreement. By agreeing to amend the letter of credit, however BCP agreed that payment under the letter of credit would not be conditioned on compliance with the loan agreement. Therefore, BCP expressly relieved Irving of the duty which it now seeks to impose by claiming fraud in the transaction. This result cannot be tolerated for it would render meaningless the parties' agreement to amend the letter of credit. *See Venizelos, S.A. v. Chase Manhattan Bank,* 425 F.2d 461, 466 (2d Cir.1970) ("a construction. rendering the contract possible of performance will be preferred to one which renders its performance impossible or meaningless"); *accord Richardson Greenshields Securities, Inc. v. Metz,* 566 F.Supp. 131, 133 (S.D.N.Y.1983) (refusing to interpret a forum selection clause in such a manner as to render one of its terms meaningless).

Even if the amendment did not discharge Irving from an obligation to inform BCP that the Walsh entities had violated the loan agreement, Irving's alleged wrongdoing would not amount to fraud in the transaction. Fraud in the transaction represents a narrow exception to the independence principle. *Emery-Waterhouse Co. v. Rhode Island Hospital Trust National Bank,* 757 F.2d 399, 405 (1st Cir.1985); *Rockwell Int'l Systems, Inc. v. Citibank,* 719 F.2d 583, 588-89 (2d Cir.1983); *Foreign Venture Limited Partnership v. Chemi-cal Bank,* 59 A.D.2d 352, 356, 399 N.Y.S.2d 114, 116 (1st Dept.1977). It is limited to situations in which the wrongdoing of the *beneficiary* has permeated the entire transaction. *See Itek Corp. v. First National Bank of Boston,* 730 F.2d 19, 25 (1st Cir. 1984); *Roman Ceramics Corp. v. Peoples National Bank,* 714 F.2d 1207, 1212 n. 12, 1215 (3d Cir.1983); *Larson v. First Interstate Bank of Arizona, N.A.,* 603 F.Supp. 467, 469 (D.Ariz.1983); Note, *"Fraud in the Transaction": Enjoining Letters of Credit During the Iranian Revolution,* 93 Harv.L.Rev. 992, 1001-02 (1980). This Court declines BCP's invitation to expand the doctrine beyond its present narrow borders.

■ Even if Irving's failure to inform BCP constitutes wrongdoing, Irving's wrongdoing was merely ancillary to the actions of the Walsh entities. Therefore, it was the wrongdoing of the Walsh entities that permeated the transaction. Since the Walsh entities are not the beneficiaries of the letter of credit, their wrongdoing is irrelevant.

■ Moreover, BCP is relying upon fraud in a collateral transaction. If the letter of credit is to remain a viable tool of commerce, fraud in a collateral transaction cannot justify a refusal to pay. As the court stated in *New York Life Insurance Co. v. Hartford Nat'l Bank & Trust Co.,* 173 Conn. 492, 378 A.2d 562, 566 (1977):

one of the expected advantages and essential purposes of a letter of credit is that the beneficiary will be able to rely on assured, prompt payment from a solvent party; necessarily, a part of this expectation of ready payment is that there will be a minimum of litigation and judicial interference, and this is one of the reasons for the value of the letter of credit device in financial transactions.

Inquiry into collateral contracts under the doctrine of fraud in the transaction would eviscerate the commercial utility of the letter of credit by increasing the potential for litigation and judicial interference. Thus, fraud in a collateral contract is no defense to the proper performance of a letter of credit contract. *See* Harfield, *Enjoining*

*Letter of Credit Transactions,* 95 Banking L.J. 596, 605–06 (1978).

In the instant case, the contract on which BCP bases its claims of fraud is twice removed from the letter of credit. The letter of credit secures the loan agreement between Irving and Cherokee. The contract in which BCP alleges there was fraud is the loan agreement between BCP and the Walsh entities. Irving was not a party to the latter contract, nor was it mentioned in the final version of the letter of credit. Thus, the fraud complained of was collateral to the letter of credit. The Court cannot deny Irving its right to payment on the basis of this fraud without vitiating the commercial utility of the letter of credit.

### III. *Conclusion*

For the foregoing reasons, the motion for summary judgment is granted. Settle order.

SO ORDERED.