Barclay Knitwear Co., Inc., et al., Appellants, v King'swear Enterprises Ltd., et al., Defendants, and National Westminster Bank, U.S.A., Respondent. Bank of Communications, Intervenor-Respondent-Cross-Appellant.

First Department, November 10, 1988

## APPEARANCES OF COUNSEL

*Stephen M. Harnik* of counsel *(Wachtell, Manheim & Grouf,* attorneys), for appellants.

*Eugene F. Farabaugh* of counsel *(Andrew J. Connick* and *Anne M. Ronan* with him on the brief; *Milbank, Tweed, Hadley & McCloy,* attorneys), for intervenor-respondent.

## OPINION OF THE COURT

SULLIVAN, J.

This appeal presents the issue of whether the circumstances of a bank's negotiation of a draft drawn under a letter of credit established it as a holder in due course and, if so, whether the documents submitted on the draw against the credit conform to its requirements so that, notwithstanding the possibility of fraud in the transaction, the draft must be honored by the issuing bank pursuant to Uniform Commercial Code § 5-114 (2) (a).

Since 1978, Barclay Knitwear Co., Inc. and its subsidiary, Brooke Sweater Co., Inc. (collectively, Barclay), importers of men's and boys' wearing apparel, had successfully used King's-wear Enterprises Ltd. and its principal, Amy Lee, as their agent in Taiwan. Barclay's would negotiate directly with the local Taiwan manufacturers regarding the style, quality and

quantity of the merchandise it desired. Payment would be effected by the issuance of a transferrable letter of credit to King'swear, which would then assign the credit to the specified local manufacturer. Ms. Lee was given presigned blank inspection certificates which she was authorized to sign on Barclay's behalf once the goods were ready for delivery.

In February 1985, Barclay entered into contracts with King'swear and other Taiwan manufacturers for the production of approximately 13,000 dozen men's and boys' sweaters, with payment to be made by irrevocable letter of credit. In all, Barclay caused six letters of credit to be issued, each naming King'swear as beneficiary. Of the six, only one, an assignable $209,650 letter of credit issued on February 25, 1985 by National Westminster Bank, USA (Natwest), is at issue. The credit provided that it was payable upon presentation of King'swear's draft, accompanied by certain documents, including a "Special Customs Invoice One 'VISAED' Original and two photocopies indicating Quota Category #645."

In this particular transaction, it is alleged that instead of transferring the letters of credit to the local manufacturers with whom Barclay had previously made arrangements, Ms. Lee, apparently in deep financial trouble, assigned them to manufacturers not known to Barclay. According to Barclay, Ms. Lee also changed the terms of the contract so that fewer garments were being manufactured for the agreed price. As a result, Barclay found that it was being charged double and sometimes triple the contract price. Ms. Lee, it alleges, received kickbacks from these overcharges. On the basis of her actions in this matter, Barclay has caused criminal proceedings to be instituted against Ms. Lee in Taiwan.

In any event, on March 9, 1985, King'swear assigned $180,000 available under Natwest's $209,650 letter of credit to Lucky Jewel Knitwear Corp., which, on April 25, 1985, after several minor amendments had been added, applied in writing to Bank of Communications (BOC) to negotiate its draft for $180,000 under the letter of credit. After determining that the draft and the accompanying documents complied with the terms of the credit, BOC negotiated the draft and applied $50,250.26 of its proceeds in payment of Lucky Jewel's loan indebtedness to it, $1,901.68 for banking charges, and the balance of $128,657.06 as a credit to Lucky Jewel's account at BOC. On the same day, BOC forwarded the draft, accompanied by the documents required by the letter of credit, to Natwest for payment. On May 13, 1985, Natwest informed BOC that it

would not honor the draft on the ground that the visa stamp on the special Customs invoice showed numbers 645/646, not number 645 only, as required by the credit.

After Natwest informed BOC that it would not honor Lucky Jewel's draft, Barclay obtained a temporary restraining order prohibiting Natwest from honoring drafts drawn against the various letters of credit, including the one at issue, pending a hearing on Barclay's motion for a preliminary injunction. In support of that motion, Barclay alleged that the special Customs invoice submitted to Natwest indicated the wrong Customs quota category number, and that Barclay had been defrauded by its own agent. In asserting fraud, Barclay alleged that Ms. Lee assigned the letter of credit to Lucky Jewel, a manufacturer unknown to Barclay, in order to alter the specifications of Barclay's order and thus make the goods cheaper to produce. Barclay further alleged that Ms. Lee submitted fraudulent documentation under the letter of credit, including an inspection certificate signed by Barclay, purportedly representing that the goods had been manufactured in accordance with contract specifications.

BOC moved to intervene and to vacate the temporary restraining order. The motion court (Ira Gammerman, J.) permitted intervention and granted Barclay's motion for a preliminary injunction, finding that the visa stamp on the special Customs invoice submitted by BOC to Natwest appeared to contain a material discrepancy from the terms of the letter of credit, and that Barclay had demonstrated a likelihood of success in ultimately establishing fraud in the transaction.

■ ■ After discovery had been taken, BOC moved for summary judgment and vacatur of the preliminary injunction restraining Natwest from honoring the Lucky Jewel draft on the letter of credit. Barclay cross-moved for summary judgment converting the preliminary injunction into a permanent injunction. The court (Burton Sherman, J.) denied both motions, finding that factual issues existed which precluded the grant of summary judgment. In so concluding, the court determined that "[t]he letter required presentation of a special customs' invoice visa stamp quota category number 645." It also found that "in view of the underlying fraud claim, it would appear that a triable issue of fact is presented to determine if the intervenor bank is a holder in due course." The parties cross-appeal. Since we believe that, pursuant to the Uniform Commercial Code, BOC is entitled to payment

because it negotiated the draft under circumstances making it a holder in due course, and the documents submitted with the draft strictly complied with the terms of the letter of credit, we modify to grant summary judgment to BOC and to vacate the preliminary injunction as to it.

A letter of credit provides "a quick, economic and predictable means of financing transactions for parties not willing to deal on open accounts by permitting the seller to rely not only on the credit of the buyer but also on that of the issuing bank." *(First Commercial Bank v Gotham Originals,* 64 NY2d 287, 297-298.) It has been held that "[a] letter of credit represents a separate contract between the issuing or confirming bank and the beneficiary, independent of the contract for the sale of goods between the buyer and seller." *(Fertico Belgium v Phosphate Chems. Export Assn.,* 100 AD2d 165, 172, *appeal dismissed* 62 NY2d 802; *see, United Bank v Cambridge Sporting Goods Corp.,* 41 NY2d 254, 259.) A letter of credit is a "commitment on the part of the issuing bank that it will pay a draft presented to it under the terms of the credit, and if it is a documentary draft, upon presentation of the required documents of title". *(United Bank v Cambridge Sporting Goods Corp., supra,* at 258-259, citing Uniform Commercial Code § 5-103.) It is well settled that "[b]anks issuing letters of credit deal in documents and not in goods and are not responsible for any breach of warranty or nonconformity of the goods involved in the underlying sales contract". *(United Bank v Cambridge Sporting Goods Corp., supra,* at 259.) In New York, strict compliance with the terms of a letter of credit is required. *(United Commodities-Greece v Fidelity Intl. Bank,* 64 NY2d 449, 455; *see, Matter of Supreme Mdse. Co. v Chemical Bank,* 70 NY2d 344, 352.)

Section 5-114 (2) (a) of the Uniform Commercial Code provides that "when documents appear on their face to comply with the terms of a credit but a required document * * * is forged or fraudulent or there is fraud in the transaction * * * the issuer must honor the draft or demand for payment if honor is demanded by a negotiating bank * * * which has taken the draft or demand under the credit and under circumstances which would make it a holder in due course". Finally, it should be noted, disputes involving letters of credit "are well suited to determination by motion for summary judgment because they normally present solely legal issues relating to an exchange of documents." *(Banque Worms v Banque Commerciale Privee,* 679 F Supp 1173, 1178.)

As already noted, the letter of credit at issue required, *inter alia,* "Special Customs Invoice One 'VISAED' Original and two photocopies indicating Quota Category #645." This is a condition which is neither complicated nor vague, since it calls for one original and two photocopies of a special Customs invoice that indicates in its text that goods corresponding to quota category number 645 are being traded. It also requires that the invoice be "visaed", i.e., according to the deposition testimony of employees of both Barclay and Natwest, mailed with a visa stamp by a Customs official of the country of origin.

■ Barclay's claim that the visa stamp on the special Customs invoice must read "Quota Category #645" is unavailing. As Barclay acknowledges, the letter of credit requires two invoices, one a "Commercial Invoice one original and two photocopies indicating Quota Category #645 and Net/Net Weight by size", and the other a "Special Customs Invoice One 'VISAED' Original and two photocopies indicating Quota Category #645." Both of these invoice requirements place the phrase "indicating Quota Category #645" after the words "original and two photocopies". Since it is undisputed that the phrase "indicating Quota Category #645" with regard to the commercial invoice requirement refers to the words that directly precede it, the plain meaning of the same phrase in the clause requiring the special Customs invoice is that it too refers to the original and two photocopies of the invoice, not the visa that is to be stamped on them. Nothing in the record suggests that the phrase "indicating Quota Category #645" relates to the adjective " 'VISAED' "; nor is there any explanation as to why the identical phrase should be interpreted differently in two parallel clauses. Hence, the plain meaning of the language in the requirement for the special Customs invoice must control its interpretation. "A letter of credit * * * is governed by the same general principles of law as are all other contracts in writing". *(Zeevi & Sons v Grindlays Bank,* 37 NY2d 220, 225, *cert denied* 423 US 866.)

Moreover, even if the special Customs invoice requirement did contain ambiguity and the plain meaning doctrine were inapplicable, in accordance with well-settled principles, the phrase at issue would have to be construed against the drafter. *(See, United States v Sun Bank,* 609 F2d 832, 833; *Data Gen. Corp. v Citizens Natl. Bank,* 502 F Supp 776, 784; *Republic Natl. Bank v Northwest Natl. Bank,* 578 SW2d 109, 115 [Tex].)* Since the drafters here are Barclay and/or Nat-

west, in the face of ambiguity, the letter of credit should be interpreted in favor of BOC.

Additionally, well-established rules of interpretation refute Barclay's claim that the visa stamp on the special Customs invoice must state "Quota Category #645". As a general rule, "guidance may be drawn from consideration of the rules of composition." (2A Sutherland, Statutory Construction § 47.01, at 118.) In that regard, "the position of words in a sentence is the principal means of showing their relationship." (Strunk and White, Elements of Style, at 28 [1979].) The position in the letter of credit of the phrase "indicating Quota Category #645" makes it clear that it modifies the nouns that it follows, i.e., "[o]riginal, and two photocopies". "Modifiers should come, if possible, next to the word they modify." *(Id., at 30.)* "Referential and qualifying words and phrases * * * refer solely to the last antecedent." (2A Sutherland, Statutory Construction § 47.33, at 245.)

In any event, even if we were to assume that in opening the letter of credit the parties intended the phrase "indicating Quota Category #645" to modify the word " 'VISAED' ", and that the requirement should thus be interpreted to mean that the visa stamp must not only indicate but also actually state verbatim "Quota Category #645", we would nevertheless, given this record, reject Barclay's interpretation. According to John Marturano, an import specialist employed by the United States Customs Service, whose affidavit was submitted in support of BOC's motion, the visa stamp stating "Quota Category #645" is no longer in use. Pursuant to an agreement between the American Institute in Taiwan and the Coordinating Counsel for North American Affairs, goods imported into the United States from the Republic of China are authenticated by placing a visa stamp on the special Custom invoice to assure that the goods are classified under a specific Customs quota category. In 1985, pursuant to that agreement, Customs quota category number 645, which refers to men's and boys' synthetic sweaters, and customs quota number 646, which refers to women's and/or juvenile synthetic sweaters, were merged. As a result, visa stamp number 645/647 is now used for authenticating goods belonging to either category. Indeed, if there were any doubt as to the proper quota classification, the special Customs invoice states elsewhere on its face that the goods are being shipped under quota category "#645". Furthermore, in view of its extensive experience in importing garments from Taiwan, Barclay should have known that

number 645/646 is the appropriate visa stamp for goods in quota category number 645.

Barclay's interpretation would prevent any negotiating bank from submitting documentation that conforms to the requirements of the letter of credit. Such a result "cannot be tolerated for it would render meaningless the parties' agreement to * * * the letter of credit." *(Banque Worms v Banque Commerciale Privee, supra,* 679 F Supp, at 1182.) "[A] construction rendering the contract possible of performance will be preferred to one which renders its performance impossible or meaningless." *(Venizelos, S.A. v Chase Manhattan Bank,* 425 F2d 461, 466.)

Thus, we reject Barclay's claim that the letter of credit requires that a visa stating "Quota Category #645" be stamped on the requisite special customs invoice. The only reasonable interpretation of the clause calling for a special Customs invoice is that it requires an invoice indicating that goods which correspond to quota category number 645 are being shipped, and that the invoice be stamped with the visa stamp for goods in that category, i.e., "645/646". BOC undeniably complied with both of these requirements.

We also find, as a matter of law, that BOC is a holder in due course, which is defined as one who takes an instrument for value, in good faith, and without notice that it is overdue or has been dishonored, or of any defense against or claim to it on the part of any person. (Uniform Commercial Code § 3-302 [1]; *see, United Bank v Cambridge Sporting Goods Corp.,* 41 NY2d 254, *supra.)* With respect to the negotiation of the Lucky Jewel draft drawn on the Natwest letter of credit, BOC paid $180,000, less bank charges, to Lucky Jewel, applying a portion of the proceeds to discharge a previous loan by it to Lucky Jewel and crediting the remainder of the proceeds to Lucky Jewel's account. BOC exercised good faith in negotiating the document, having reviewed the supporting documentation to insure that it complied with the terms of the letter of credit. Finally, as is clear from the deposition testimony of Mr. Chang, its senior vice-president, BOC did not have any knowledge of Lucky Jewel's or Ms. Lee's alleged fraud.

This direct testimonial evidence that BOC acted in good faith is bolstered by strong circumstantial evidence. *(Compare, United Bank v Cambridge Sporting Goods Corp., supra,* at 263, where the only evidence that the banks introduced to prove their status as holders in due course "consisted of conclusory

answers to the interrogatories which were improperly admitted by the Trial Judge".) For example, the application signed by Lucky Jewel in the negotiation of the letter of credit is the standard form that BOC requires of all its customers in the course of such a negotiation. This undisputed fact further refutes the finding of the motion court in granting the motion for a preliminary injunction that BOC had "deviated from its normal custom and practice" when it negotiated the draft presented by Lucky Jewel.

Even more revealing on the issue of BOC's good faith is the extent of the consideration it gave for Lucky Jewel's draft. As explained by its senior vice-president, BOC would never have negotiated Lucky Jewel's draft if it had any knowledge of fraud by Lucky Jewel, since by accepting a portion of the proceeds of Lucky Jewel's draft in payment of its indebtedness to BOC, BOC relinquished a guarantee of the debt. Prior to the negotiations of the draft under the letter of credit, repayment by Lucky Jewel of 90% of its indebtedness to BOC was guaranteed by the Small and Medium Business Credit Foundation (SMBCF), which provides services in the Republic of China similar to those provided by the Small Business Administration in the United States. Pursuant to its terms, however, the guarantee terminated once documents were presented for negotiation under the letter of credit. Accordingly, by negotiating Lucky Jewel's draft, BOC terminated both Lucky Jewel's indebtedness to it and SMBCF's guarantee. As the senior vice-president noted, "if BOC had knowledge of any fraud on the part of Lucky Jewel, BOC would not have negotiated the letter of credit and would instead have relied on the SMBCF's guarantee [of] repayment of its loan to Lucky Jewel."

Notwithstanding this uncontradicted evidence, Barclay asserts that its allegations of fraud cast a shadow over BOC's status as a holder in due course. Since proving a negative, i.e., lack of notice of the alleged fraud, is concededly difficult, if not impossible, BOC's status as a holder in due course is beyond dispute, absent some direct evidence that it had notice of the alleged fraud. The reliability of commercial letters of credit as a medium of payment in international commerce would be seriously eroded if one's status as a holder in due course could be so readily undermined by such tenuous claims.

Barclay's allegation of fraud in Taiwan has nothing to do with BOC's having given value for Lucky Jewel's draft, or BOC's good faith, or BOC's lack of notice of any defenses to

the draft.* Nor does Barclay's facile argument that BOC should pursue some remedy other than this litigation in any way impugn BOC's status as a holder in due course. Under section 5-114 of the Uniform Commercial Code, a holder in due course is not required to pursue other available remedies as a condition to recovery on its draft. "To draw on a letter of credit, the beneficiary need only establish that it has strictly complied with its essential requirements." *(Banque Worms v Banque Commerciale Privee, supra,* 679 F Supp, at 1178, citing *Marino Indus. Corp. v Chase Manhattan Bank,* 686 F2d 112, 114.)

Accordingly, the order of the Supreme Court, New York County (Burton Sherman, J.), dated January 29, 1988 and entered February 5, 1988, which denied the cross motions for summary judgment, should be modified, on the law, to grant summary judgment to BOC and to vacate the preliminary injunction as to it and, except as thus modified, affirmed, without costs or disbursements.

Carro, Milonas and Smith, JJ., concur with Sullivan, J.; Kupferman, J. P., dissents for the reasons stated by Sherman and Gammerman, JJ.

Order, Supreme Court, New York County, entered on February 5, 1988, modified, on the law, to grant summary judgment to Bank of Communications and to vacate the preliminary injunction as to it and, except as thus modified, affirmed, without costs and without disbursements.

---

* Barclay's assertion that BOC might be a party to Ms. Lee's and Lucky Jewel's fraudulent conduct is ironic in light of its own conduct, which permitted the alleged fraud to occur. Barclay has admitted that it provided King'swear with presigned inspection certificates, thereby enabling Ms. Lee to perpetuate the fraud in question. In such circumstances, it should bear any resulting loss. " '[W]here one of two innocent persons must suffer by the acts of a third, he who has enabled such third person to occasion the loss, must sustain it' ". *(Bunge Corp. v Manufacturers Hanover Trust Co.,* 31 NY2d 223, 228, quoting *National Safe Deposit Co. v Hibbs,* 229 US 391, 394.)