**TEXPOR TRADERS, INC., Plaintiff,**

v.

**TRUST COMPANY BANK and Oxford Industries, Inc., Defendants.**

87 Civ. 9224 (BN).

United States District Court,
S.D. New York.

Sept. 12, 1989.

Chapman, Moran, Hubbard & Zimmermann, by Victor L. Zimmermann, Jr., of counsel, Stamford, Conn., for plaintiff.

Otterbourg, Steindler, Houston & Rosen, P.C., by Kurt J. Wolff and Diane B. Kaplan, of counsel, New York City, for defendants.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

NEWMAN, Senior Judge of the United States Court of International Trade, sitting as a District Court Judge by designation:

## INTRODUCTION

This is an action for breach of contract regarding the sale of certain cotton sweatshirts and refusal to honor a letter of credit relating to such sale. Plaintiff Texpor Traders, Inc. ("Texpor") the seller, seeks damages of $36,612., plus interest and costs from defendants Oxford Industries, Inc. ("Oxford") the buyer, for nonpayment of delivery on shipment No. 10881 ("second shipment") and from Trust Company Bank ("TCB") for refusal to honor a letter of credit issued in favor of Texpor by the Bank on behalf of Oxford.

Oxford, contending the merchandise was defective, counterclaims for $61,036.40 paid to Texpor under the letter of credit for shipment No. 10882 ("first shipment") and $163,265.95 for lost profits on confirmed customer orders and potential customer orders (for both shipments) that Oxford claims it was unable to deliver because of defects in the merchandise.

The court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) (1982), and as set forth in the contract agreement, the law of New York governs this action.

For the reasons set forth below, plaintiff's claim for breach of contract is dismissed. Oxford's counterclaim is sustained for $7,836.65 in compensatory damages ($61,036.40 paid by Oxford on the first shipment minus $33,100 Oxford recovered on the resale of the first shipment and $20,099.75 it recovered on the resale of the second shipment) plus $111,112.78 for consequential damages in the form of lost profits.

Plaintiff's claim against the Bank is also dismissed. Under the facts in this case, plaintiff did not strictly comply with the requirements of the letter of credit; hence, the bank was justified in its refusal to honor the letter of credit.

## FINDINGS OF FACT

1. Texpor is a corporation duly incorporated under the laws of Connecticut. As of March 30, 1987 Texpor maintained its principal place of business at 1412 Broadway, New York, N.Y. 10018 and had been in business for approximately only one year.

2. Oxford is a corporation, incorporated under the laws of Georgia with its principal place of business in Atlanta, Ga. Oxford has been in business for over twenty-five years. As of March 30, 1987 Oxford maintained a sales office in the Empire State Building on 34th Street in New York City.

3. Trust Company Bank is a state chartered trust company under the laws of Georgia with its principal place of business in Atlanta, Ga.

4. On September 11, 1986 Oxford submitted purchase orders Nos. 10876, 10877, 10880, 10881 and 10882 to Texpor under which Oxford agreed to purchase and Tex-

por agreed to sell a quantity of one hundred per cent French terry or knit cotton sweatshirts, pursuant to the terms and conditions set forth within the above cited purchase orders. Purchase order Nos. 10882 and 10881 state in pertinent part:

> All goods not merchantable or not in compliance with the specifications [set forth] ... may be rejected by the Buyer and returned or held at Seller's expense.... Any complaint, claim, notice of defect, or notice of breach, whether with respect to quality, quantity, or any other defect or breach, *shall be considered timely if made by the Buyer within thirty (30) days after Buyer discovers or learns of such defect or breach.*
>
> \*　\*　\*　\*　\*　\*
>
> *Time is of the essence* of the respective obligations of the parties hereunder, including Seller's obligation to ship goods or to have goods ready for shipment on the dates specified herein.

*See* Plaintiff's Exhibit Nos. 2–3 [hereinafter "PX "*n* "] (emphasis added).

5. All of the sweatshirts under these purchase orders were part of a single line of clothing or program at Oxford called the "Robert Stock Program." Further, Casimir Taxier ("Taxier"), president of Texpor, was aware that the purchase orders constituted a single, indivisible program at Oxford. The Robert Stock Program was ultimately discontinued and all customer orders cancelled as a result of Texpor's failure to deliver conforming goods to Oxford.

6. Each purchase order specified that the sweatshirts, whether French terry or knit, were to be "first grade goods," *see* PX 1–3, and contained the seller's express warranty that "all goods ... will be of first quality and merchantable and fit and sufficient for the purposes intended by the buyer." *Id.*

7. Taxier was aware that the garments to be produced in accordance with the pur-

chase orders were intended for resale in both top quality department stores, such as Saks Fifth Ave.,[1] and specialty retail stores and boutiques.

8. Before giving Texpor the written purchase orders, Oxford provided Texpor with specification sheets and size grades, and requested that Texpor provide prototype samples. The initial samples did not meet Oxford's specifications and required corrections. The corrected samples were approved by Oxford's purchasing Agent, Renee Nesbitt Baird ("Baird").

9. Baird made two visits to Portugal, the first in December, 1986 and the second on January 26, 1987 to check Texpor's production facilities. On her first visit, Baird did not see the factory where the garments were actually under production. There were two factories where the goods were being manufactured, and Baird only visited one of them. Instead, six finished garments from shipment No. 10882 were brought to her for inspection and she found them to be of acceptable quality. *See* Defendant's Exhibit R at 50, 57 [hereinafter "DX "*A* "]. On her second visit, Baird again viewed several garments, but this time from shipment No. 10881. *Id.* at 60–61. By that time all the garments from shipment No. 10882 had already been forwarded to the United States. The remaining production under shipment No. 10881 had already been packed and was awaiting shipment. Thus, no one from Oxford ever saw shipments Nos. 10882 and 10881 until their arrival in Georgia on January 29, 1987 and February 12, 1987, respectively.

10. In connection with the purchase orders, Oxford arranged for TCB to issue an irrevocable letter of credit in favor of Texpor in the amount of $242,448.25. This letter of credit was later amended four times, presumably to accommodate Texpor's delay in delivery of the first and second shipments, the last amendment extending the latest shipping date for the

---

**1.** It is evident that Texpor knew the sweatshirts were intended for top quality department stores. A large part of the first shipment was intended to fill a Saks order. That store—universally recognized as a top quality department store— specifically requested that the manufacturer sew Saks labels on the inside collars of the sweatshirts. Thus, the garments themselves indicate Texpor must have known to whom the sweatshirts were intended for resale.

second shipment to February 10, 1987. *See* PX 4.

11. On January 20, 1987 Texpor shipped garments under purchase order No. 10882 (first shipment) to Oxford and issued invoice No. 101 for 6,620 sweatshirts of lot No. 24–7005. On January 29, 1987 Oxford received the merchandise and Texpor received payment in full that very date under the letter of credit for $61,036.40. Since payment for the first shipment was made on the same day, Oxford had no time to inspect the goods prior to payment.

12. On February 3, 1987 Texpor shipped garments to Oxford under purchase order No. 10881 and issued invoice No. 102 for 3,450 sweatshirts (second shipment) in the total amount of $36,612. Texpor, to date, has not received payment for this shipment. TCB refused to honor the letter of credit, insisting that documents presented by plaintiff-beneficiary Texpor did not comply with the requirements of the letter of credit.

13. From January 29, 1987 to February 4, 1987 Oxford conducted routine quality audits of the first shipment, *see* DX D(1)–(9), and from February 12, 1987 (immediately upon receipt of the second shipment) to February 25, 1987 Oxford conducted routine quality audits of such second shipment.

14. These quality audits revealed defects in most of the sweatshirts, defects ranging from improper stitching and holes in the fabric to soiled or dirty garments and lack of uniformity in fabric weight and color. Some of the audits even bear the auditor's note that the garments received were damp and had an "odor." *See, e.g.,* DX D(1), (8). Following the audits, the sweatshirts were replaced in their bags, boxed up, and classified as "irregulars."

Trial Transcript at 141, 154 [hereinafter "Tr. *X*"].

15. Claudette Hayes ("Hayes"), the quality audit supervisor at Oxford, notified Karen Hilton ("Hilton"), Oxford's merchandise manager, informing her of the problem. Hilton reviewed the audits, and in turn, notified Baird that she had observed "a lot of shading within the sweatshirts, a lot of bad stitching, and [that] the goods were [ ] wet and had an "odor." Tr. 165. Additionally, Hilton sent samples of the defective goods to Baird in Oxford's New York office.

16. Baird testified in her deposition that the merchandise Oxford received under purchase orders Nos. 10882 and 10881 did not conform to the quality of the production samples that Taxier had shown her in Portugal during her visits to the factory in December, 1986 and January, 1987. DX R at 65 (Deposition of Renee Nesbitt Baird).

17. The court finds that the quality audits conducted by Oxford on the first and second shipments constitute statistically valid random samples and thus are representative of the defects in the shipments as a whole. Hayes served as a supervisor of quality audits at Oxford for five years and has conducted hundreds of audits. Tr. 70–71. She testified that, relative to the first shipment, three auditors sampled fifty shirts from each color representing six of the styles and thirty-two shirts from the remaining three styles. *See* DX C at 2. For the second shipment, four auditors sampled eighty shirts from four different styles and one hundred and twenty-five shirts from the remaining style. *Id.* at 4. In total, out of the 10,570 sweatshirts received by Oxford, 841 were pulled at random for audits. Each style was audited separately, and the sample size for each audit was greater than thirty.[2]

2. The court takes judicial notice that in statistical analysis, using a well known mathematical theorem, *viz.,* the Central Limit Theorem, a sample size of thirty or more is generally recognized as sufficient to guarantee normality of the distribution of sample means. Fed.R.Evid. 201. This is important because in most problems involving sampling, the standard deviation of the given population is unknown. Sample statistics are, therefore, substituted for population parameters and can also be used to define the standard error of the mean. *See generally* W.C. Curtis, *Statistical Concepts for Attorneys* (1983). The court also notes that the smaller samples of thirty-two were taken from orders of less than two hundred and fifty and in each case the sample statistic represented over fifteen percent of the total population, a more than adequate statistical representation.

Hayes stated that using military standards for what is considered an appropriate sampling for an audit, she conducted a random sample of the first and second shipments.

The results of Hayes' audits revealed that in some cases as many as sixty-four percent of the garments tested were defective. *See* DX D(1), (4), (5), (6).

█ 18. At trial, Oxford also presented a qualified expert, Fred Gerson ("Gerson"), whose uncontroverted testimony emphasized that the goods in question were not of first quality. Gerson has twenty-eight years of retail experience in men's and women's sportwear. He is thoroughly familiar with every facet of the industry, having risen from a shipping and receiving clerk to become president of the company and a member on the board of directors for Oshman's Sporting Goods, Inc. Tr. 75–77. Gerson's experience ranged from a floor salesman to an assistant buyer and a merchandise manager. Moreover, judging from his demeanor at trial, the court finds Gerson to be a candid and highly credible witness.

Gerson testified that of the seventy garments[3] he thoroughly examined, ninety percent had material defects such as holes in the fabric, excess puckering, defects in the stitching, different shades of color in the same style of garment, different fabric weights and different grades of [cotton] in the same line of clothing. He commented that many of these garments would be unacceptable as "first quality" goods and, in point of fact, referred to them as "seconds" or "irregulars." Tr. 105–06. Gerson stated, "I do not believe a retail store would have this [product] on the floor ... Saks Fifth Avenue, [or any] department store[ ] will not deal in " 'seconds.' " Tr. 102, 112.

█ 19. The court thus finds that the goods Texpor delivered to Oxford under purchase orders Nos. 10882 and 10881 were materially defective and not of "first quality" as the contract specified and the parties understood that term: Based on the uncontroverted testimony of defendants' expert, the quality audits, and on the very credible testimony of Hilton and Hayes, in addition to having carefully examined the seventy or so odd garments presented as exhibits, the court cannot find otherwise.[4]

20. On January 29, 1987, immediately after the arrival of the first shipment, Oxford began conducting its quality audits. By February 4, 1987 Oxford completed its audits of the first shipment. Shortly thereafter, Hilton called Baird and informed her of the quality problems with the garments. By the end of the first week in February, Baird had called Taxier and "told him [the first shipment] was a major problem and [that] she needed to see him." DX R at 30.

Baird arranged for a meeting in her office on or about mid-February.[5] At the

---

**3.** Plaintiff argues that the seventy garments do not constitute a representative sample of the sweatshirts taken from the quality audits and thus are inadmissible as evidence of defects in the entire shipments. Plaintiff's argument misses the point. As Hilton testified "[t]hese [seventy garments] were not intended to constitute a representative sample. [The] original audits were." Tr. 183. (*See supra* p. 7 for a discussion on the statistical validity of the original audits.) Plaintiff further raised a question regarding the chain of custody and whether the seventy sweatshirts presented as exhibits at trial were the actual garments that Texpor shipped to Oxford under purchase orders Nos. 10882 and 10881. Hayes' testimony, in which she definitively identified the sweatshirts as those she examined as part of the quality audits and sent to Renee Baird's New York office, satisfies the court that these are indeed the goods which gave rise to the complaint.

**4.** Defendants aptly point out that Oxford would have had no reason to reject the sweatshirts unless they were defective. Indeed, Oxford held confirmed customer orders for these sweatshirts, and had the goods been marketable would have earned a substantial profit. The forfeiture of such profit is credible circumstantial evidence that the shirts were simply not "first quality" goods. *See* Defendants' Reply Post–Trial Memorandum at 6.

**5.** There is conflicting testimony about who was present at the meeting, Baird claiming that both Taxier and Liberman were present, and Taxier claiming that he never attended the meeting but instead sent Liberman to look at the goods. Taxier also asserted that Baird's telephone call could not have related to the first shipment because she had mentioned something about "prints," and only the second shipment had prints; the first shipment consisted of solid col-

meeting, Taxier was accompanied by Leo Liberman ("Liberman") whom Taxier represented to Baird as his partner at Texpor (Taxier denied this at trial, maintaining he merely shared office space with Liberman). Baird showed the two men some of the defective goods and they agreed there was a problem. DX R at 31. At this point, Baird unequivocally stated to Taxier that the quality of the goods received by Oxford was unacceptable. In sum, Baird specifically informed Taxier that Oxford would not accept the entire shipment, was considering cancelling the remaining purchase orders, and would return the garments to Portugal. *Id.* at 72.

21. Because of certain quota restrictions on goods manufactured in Portugal, *see* DX R at 72–75, Texpor allegedly could not return the sweatshirts to its Portugese manufacturer. Consequently, Oxford via Baird offered to "dump" the goods at a discount price in order to "try to help out Texpor," DX R at 35, and it was agreed by Taxier that "[Texpor] would absorb the loss." *Id.* at 94.

22. Further, Baird contends that she wrote a letter notifying Texpor that Oxford would not accept the sweatshirts. There was no evidence, however, of any such letter. Baird's explanation for the absence of the letter was that after the Robert Stock Program fell through (Baird subsequently left Oxford), Oxford closed its New York office and the relevant files were lost. In any event, Gerson testified that in all his years in the apparel industry he never gave written notice of defective goods to a seller, and that such notice was usually given by telephone. Tr. 123.

23. After the February meeting, communications between Baird and Taxier apparently ceased. Taxier returned to Portugal in mid-February, while Baird continued to communicate with Liberman in Texpor's New York office regarding what had to be done about the first shipment and the possibility of cancelling the remaining purchase orders. DX R at 39.

24. On February 12, 1987 the second shipment arrived. The quality audits on this shipment were conducted (immediately after arrival of the shipment) from February 12 to February 25. Prior to February 25, however, Taxier had departed for Portugal. Again, the same problems occurred with the second shipment, *e.g.,* holes in the fabric, bad stitching, dampness and odor. Baird called Liberman and advised him that Oxford would not accept the goods delivered under purchase order No. 10881. At that juncture, Oxford cancelled the letter of credit (the letter of credit technically had expired because the goods were delivered two days late). Baird attempted to cancel the remaining purchase orders but could not reach either Taxier or Liberman. Significantly, both Hilton and Baird attempted to contact Texpor regarding the second shipment. Baird complained that she repeatedly left messages with Texpor's answering service but never received a return call. Hilton testified that in early March she called Texpor's office for five consecutive days and was always switched to another line; she never even was able to leave a message. Tr. 179. Baird had Taxier's home telephone number but could not reach him there because the number had been changed. DX R at 37–38.

ored shirts only. Tr. 35. Hence, argues plaintiff, if Texpor ever received notice of any defects, such notice concerned only the second shipment. Because reasonable notice to the seller is a factual determination upon which this case rests, *see Sherkate Sahami Khass Rapol Constr. Co. v. Henry R. Jahn & Son,* 701 F.2d 1049, 1051 (2d Cir.1983) and because there is much conflicting testimony about who heard what from whom, the court, judging from the witnesses' demeanor at trial and the overall picture which emerged from the testimony and documentary evidence presented, emphasizes that Taxier's version of events strains credulity.

For example, at trial Taxier testified that while in the United States he had never seen any of the garments delivered from Texpor to Oxford under purchase orders Nos. 10882 or 10881, stating that he had only seen them in the factory in Portugal. Tr. 52. This contradicts his previous testimony that both he and Liberman had examined the samples from the first shipment together after his return from Portugal in early February. Tr. 42. Moreover, this inherent contradiction lends credence to Baird's testimony that both Taxier and Liberman were present at the meeting in February concerning the first shipment.

25. After delivery of the second shipment, Texpor endeavored to collect from TCB payment for delivery under the letter of credit. Although TCB had honored Texpor's request for payment on delivery of the first shipment, noting discrepancies in the documents presented for payment of the second shipment, TCB refused to honor Texpor's request for payment, indicating that the documents did not strictly conform to the requirements underlying the letter of credit. *See* DX L. For example, the address on the commercial invoice is different from either Oxford's business address or the notification address on the letter of credit. The invoice reads "Oxford Industries, Inc., Robert Stock Division, Dept. 0A5, P.O. Box 510, Lyons, Ga. 30436, Attn: Sue Turner," rather than the applicant-Oxford's business address, "Oxford Industries, Inc., P.O. Box 1618, Atlanta, Georgia, 30301," or the notification address as it appears on the letter of credit, "Holbrook Co., Robert Stock Division, 350 Fifth Avenue, New York, New York 10018, Attn: Kathie Grey." *See* PX 4. The invoice also failed to specifically include the word "Oxford" in describing the purchase order as it appears on the letter of credit. Additionally, on all of the documents submitted to TCB, plaintiff failed to include "Rm. 966" as part of plaintiff's address. The letter of credit, on the other hand, reads specifically: Texpor Traders, Inc., 1412 Broadway, *Rm 966*, New York, New York, 10018. PX 7 (emphasis added).

26. Texpor, through its attorneys, sent a letter to TCB dated March 10, 1987 informing TCB of Texpor's intention to pursue its legal remedies against TCB if payment under the letter of credit was withheld. *See* Court Exhibit 1.

27. Since Oxford had no alternative, Oxford subsequently was compelled to resell 6,453 shirts for $5.00 per shirt from the first shipment and 2601 shirts for $4.75 per shirt from the second shipment to Marshalls, Inc., a Massachusetts based discount store. DX H, I. The remaining shirts were sold to Oxford employees for either $4.75 or $5.00 per shirt. Oxford thereby recovered a total of $53,199.75, representing $33,100 on the resale of the first shipment and $20,099.75 on the resale of the second shipment.[6]

28. Oxford had confirmed customer orders for the sweatshirts, *see* DX F, from several highly regarded department stores, including Saks Fifth Avenue, B. Altman and Abercrombie & Fitch, and over fifty specialty shops and boutiques. More, Oxford showed some of the shirts to its customers. In particular, Saks Fifth Avenue had placed an order for 3900 style 7005 shirts. Part of the first shipment was intended to fill this order. Saks, however, determined that the goods were unacceptable, and Oxford thereupon agreed to cancel the Saks order. Tr. 167. Oxford, thereafter, cancelled the remaining customer orders because as Hilton testified, "We didn't feel the goods were shippable." *Id.*

29. Oxford presented complete and undisputed evidence of lost profits in the form of cancellations on the confirmed customer orders in the amount of $111,112.78. DX F (computerized printouts of order confirmations and cancellations); *see also* DX G (summary of confirmed customer orders); Defendant's Proposed Findings of Fact at 5–7 (tabular analysis of price per item sold on confirmed customer orders and acquisition cost of such items). Further, Oxford contends that were it able to complete its confirmed sales on all the goods ordered from Texpor, it would have earned an additional profit of $52,153.17. Oxford presented no evidence, however, of such prospective sales, and the court will not speculate in attempting to assess them.

30. Plaintiff claims that approximately the same time Texpor was shipping goods to Oxford, it was also delivering 50,000 of exactly the same French terry sweatshirts, produced by the same manufacturer in Por-

---

**6.** Marshalls was not the only store to which Oxford resorted in attempting to sell the goods. Oxford contacted several companies without success: Oxford even declined an offer of $2 per shirt it received from a New York company.

Oxford, then, held the goods from March 1987 to May 1988 because it did not receive any offers for the goods that it felt were acceptable. Tr. 181.

tugal, to another company in Seattle, Washington, *viz.*, Union Bay Corporation. Tr. 192. Of the 50,000 garments shipped, plaintiff asserts that only 7000 pieces were found unacceptable, and that Texpor resolved this problem by granting Union Bay a fifteen percent discount off the purchase price on these garments. Plaintiff adduced no evidence, whatever, that any goods had actually been delivered to Union Bay; there were no invoices, no bill of lading or a letter of credit. The short of the matter is that plaintiff presented no evidence, other than Taxier's bald assertion, that Texpor had manufactured "first quality" merchandise for Union Bay.

31. Assuming *arguendo* plaintiff had delivered such shirts to Union Bay, such contention has no bearing on the present case. Texpor allegedly received $140,000 from Union Bay for delivery of 50,000 sweatshirts. Tr. 205. Simple division reveals the average purchase price is less than $3 per sweatshirt. The average purchase price that Oxford paid on the first shipment was $9.22 per sweatshirt. For the second shipment Texpor was to receive from $8.62 to $9.72 per shirt. In point of fact, Oxford sold the garments as "seconds" to Marshalls at $4.75 to $5.00 per shirt. *See* DX J, K. As defendants' expert testified, there are many different grades of wool, of cotton, of thread, and price points involved in selecting and purchasing garments. Tr. 83–84. And different prices usually mean different grades of quality. Thus, even if Texpor sold sweatshirts to another company, the garments were sold at a price less than the price Oxford received for selling the sweatshirts as "irregulars." It is disingenuous, therefore, for plaintiff to argue that because Union Bay paid $3 per shirt for *exactly the same garments* that Texpor shipped to Oxford, that Oxford should be obliged to accept them as "first quality" goods at a purchase price 300% greater than what Texpor allegedly had received from Union Bay!

## CONCLUSIONS OF LAW

32. Once goods have been delivered by the seller (Texpor) to the buyer (Oxford), the buyer is under a duty to accept or reject the goods. N.Y. Uniform Commercial Code Law §§ 2–601, 2–602 Official Comment, n. 3 (McKinney 1964) [hereinafter U.C.C. § *x-xxx*]. The buyer, of course, has a right to inspect the goods, and when the seller is authorized to send the goods, the inspection may occur after their arrival. U.C.C. § 2–513.

33. Having decided that the goods Texpor delivered to Oxford were non-conforming, *i.e.*, not of "first quality" and unacceptable for the intentions of and use by the buyer, the issue in this case is whether Oxford accepted or rightfully rejected the goods.[7] Acceptance occurs when either (a) after a reasonable opportunity to inspect the goods, the buyer informs the seller that the goods are conforming or that he will retain them in spite of their non-conformity, or (b) the buyer, after a reasonable opportunity to inspect, fails to make an effective rejection. Pursuant to U.C.C. § 2–602, "[r]ejection of goods must be within a reasonable time after their de-

---

7. In the alternative, defendants urge that Oxford either revoked acceptance of the goods, U.C.C. § 2–608, or seasonably notified Texpor of a breach. U.C.C. § 2–607. Because the court renders its decision based on Oxford's rightful rejection of the goods, these issues become moot. The court notes, however, that under either analysis the period for what constitutes a reasonable time for notification should be extended. U.C.C. § 2–608 Official Comment, Note 4 states, "the reasonable time period should be extended in most cases beyond the time in which notification of breach must be given, beyond the time for discovery of non-conformity after acceptance, *and beyond the time for rejection after tender.*" (Emphasis added). Fur-

thermore, the notification requirement itself is less stringent. U.C.C. § 2–607 Note 4 states:

[t]he content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched. There is no reason to require that the notification which saves the buyer's rights under this section must include a clear statement of all the objections that will be relied on by the buyer....

Thus, under the facts in this case, it appears that even if Oxford failed to properly reject the goods by making a clear statement of all its objections, it would still be entitled to revoke acceptance or sue for breach. Under any analysis, the result would be the same.

livery or tender. It is ineffective unless the buyer seasonably notifies the seller."

■ Central to this analysis is whether Oxford acted within a "reasonable time" after tender of the goods to "seasonably notify" Texpor of the defects. Moreover, what constitutes a reasonable time for the taking of any action depends upon "the nature, purpose and circumstances of such action[,]" U.C.C. § 1–204(2), and is generally a question of fact. *Sherkate Sahami Khass Rapol v. Henry R. Jahn & Son, Inc.,* 701 F.2d 1049, 1051 (2d Cir.1983); *Polygram, S.A. v. 32–03 Enterprises, Inc.,* 697 F.Supp. 132, 138 (E.D.N.Y.1988); *N. Bloom & Son (Antiques) Ltd. v. Skelly,* 673 F.Supp. 1260, 1268 (S.D.N.Y.1987).[8]

34. U.C.C. § 1–204(1) provides that whenever an action is to be taken within a reasonable time, "any time which is not manifestly unreasonable may be fixed by agreement." Further, § 1–204(3) provides that an action is taken "seasonably" when it is taken within the time agreed, or if there is no time agreed, when action is taken within a reasonable time.

■ In this case, purchase order agreement Nos. 10882 and 10881 state specifically that notice of defect "shall be considered timely if made by the Buyer within thirty (30) days after the Buyer discovers or learns of such defect." PX 2–3. The first shipment arrived on January 29, 1987 and the quality audits were completed on February 4, 1987. Since Oxford had the right to inspect the goods after their arriv-

al, *see* U.C.C. § 2–513, the time for any action taken by Oxford on the first shipment would commence only after it completed the quality audits. By mid-February, Baird had a meeting with Taxier and Liberman at which time they viewed several of the defective garments and both sides agreed there was a problem. At that time, Baird unequivocally stated that the goods were unacceptable and Oxford would not accept them. There can be no doubt, then, that Texpor was given seasonable notice of the defects regarding the first shipment.

35. The second shipment arrived on February 12, 1987 and the quality audits were completed on February 25. Consequently, under the terms of the contract, notice to Texpor of any defects in the merchandise would be timely if given within thirty days of the latter date. In early March, both Baird and Hilton unsuccessfully attempted to contact Taxier regarding problems with the second shipment. Baird managed to contact Liberman at some point and advised him the second shipment was unacceptable. She later attempted to cancel all remaining purchase orders with Texpor; however, by that time Baird had lost all contact with either Taxier or Liberman. Significantly, both Taxier and Liberman deliberately failed to respond to any communications from Oxford—and it appears to the court that Taxier deliberately became "incommunicado."

■ Oxford insists that Liberman was Texpor's agent and as such Texpor re-

---

**8.** Plaintiff relies heavily on *Sherkate Sahami Khass Rapol v. Henry R. Jahn & Son, Inc.,* 531 F.Supp. 1048 (S.D.N.Y.1982) *aff'd in part, rev'd in part,* 701 F.2d 1049 (2d Cir.1983). In *Sherkate,* the buyer of construction dump trailers, for two months after delivery of the goods, failed to give notice of non-conformity to the seller. Accordingly, the court held as a matter of law that the plaintiff-buyer had accepted the goods by its failure to reject within a reasonable period of time. *Id.* at 1059. Plaintiff quotes from *Sherkate,* noting the court went as far as to say, "[w]e would be remiss if we failed to emphasize as outrageous the lethargy, tantamount to laches, committed by plaintiff." *Id.* at 1057; *see also* Plaintiff's Post Trial Memorandum of Law at 9. Plaintiff urges this court to follow *Sherkate.* But plaintiff neglected to inform this court that *Sherkate* had been *modified on appeal* regarding the very same point on

which plaintiff relies: inexcusable delay on the part of the buyer. The Second Circuit has made it explicitly clear that, barring exceptional circumstances, (for example, where a buyer retained a paving machine for sixteen months and used it on two separate road contracts before attempting to reject it, *Brown & Lowe Co. v. Potolski,* 221 A.D. 299, 223 N.Y.S. 71 (1927), or where the buyer's claim of oil stained and improperly cut suits was not made until six months after delivery, at which point it was incorporated in the buyer's answer to the seller's complaint, and the buyer continued to make payments on account with knowledge of the defects, *Bangor Clothing Co. v. Superior Sportswear Corp.,* 22 A.D.2d 864, 254 N.Y.S.2d 415 *aff'd,* 16 N.Y.2d 1018, 265 N.Y.S.2d 901, 213 N.E.2d 312 (1965)) *the determination of what constitutes a reasonable time remains a question of fact. Sherkate,* 701 F.2d at 1051.

ceived adequate notice of the defects. Plainly, Liberman was intimately involved in all the discussions relating to the goods; Liberman worked in Texpor's office, and Taxier admittedly spoke with Liberman virtually every day from Portugal. Tr. 41.

Under U.C.C. 1–201(35), a "representative" includes an agent, an officer of a corporation, a trustee, executor or administrator, or any other person empowered to act for another. Thus, even if Liberman was not acting as Texpor's agent, for purposes of notification he most certainly was a representative. It is therefore apparent that Texpor, at the very least, had been made fully aware that there were again serious quality problems with the second shipment.

■ U.C.C. § 1–201(25) defines "notice." It reads in part:

A person has "notice" of a fact when (a) he has actual knowledge of it; or (b) he has received notice or notification of it; or (c) from all the facts and circumstances known to him at the time in question he has reason to know that it exists.

Section 1–201(26) distinguishes between giving and receiving notice and reads:

A person "notifies" or "gives" a notice or notification to another by taking such steps as may be reasonably required to inform the other in ordinary course whether or not such other actually comes to know of it. A person "receives" a notice or notification when

(a) it comes to his attention; or

(b) it is duly delivered at the place of business through which the contract was made or at any other place held out by him as the place for receipt of such communications.

The case law in New York is clear that under the general provisions of the Code, "the requirement of 'giving' or 'receiving' notice is satisfied even though the notice is not actually received, as long as reasonable steps were taken to notify the other party." *Dougherty v. 425 Development Assoc.*, 93 A.D.2d 438, 462 N.Y.S.2d 851, 853 (1983).

Clearly, under both the guidelines set forth in the Code and the interpreting case law, it is manifestly evident that Oxford took reasonable steps to seasonably notify Texpor of the defects in both the first and second shipments.

■ 36. Plaintiff argues that because Oxford failed to state with particularity any of the above mentioned defects, it consequently has waived the right to reject the goods. U.C.C. § 2–605; *see also Uchitel v. F.R. Tripler & Co.*, 107 Misc.2d 310, 434 N.Y.S.2d 77 (1980). Regarding the first shipment, plaintiff's contention is obviously without merit: as the court found, at their meeting in February, Baird had shown Taxier the defective garments, and Taxier had agreed there was a problem with the shipment.

■ As for the second shipment, plaintiff's contention also fails. Under § 2–605(1)(a), the buyer waives his rights by failing to particularize only when the seller could have cured, or under § 2–605(1)(b) the buyer waives his rights only after the seller has made a request in writing for a full and final written statement of all defects as to which the buyer proposes to rely. Neither of these circumstances is present in this case. Initially, Texpor could not have cured because the goods were already delivered late. The latest shipping date for the second shipment was February 10, 1987, but the shipment arrived late on February 12, 1987. Moreover, the purchase agreements specifically state "time is of the essence." PX 2–3. Next, Texpor made no request in writing for a full and final written statement of all the defects. In point of fact, Texpor deliberately made every effort to avoid communicating directly with Oxford and made every effort to avoid receiving communications from persons at Oxford. The purpose of § 2–605 according to Official Comments, Note 1, is to "permit the buyer to give a quick and *informal* notice of defects in a tender without penalizing him for omissions in his statement, while at the same time protecting the seller...." [9]

9. U.C.C. § 2–605 Official Comment, Note 2, states:

(Emphasis added). Consequently, Oxford did not waive its right to reject by failing to particularize.

37. Plaintiff additionally argues that Oxford's rejection is ineffective because Texpor received no written notice of the defects. *See, e.g., Polygram S.A. v. 32–02 Enterprises, Inc.,* 697 F.Supp. at 138–39; *Prompt Elec. Supply Co. v. Allen–Bradley Co.,* 492 F.Supp. 344, 347 (E.D.N.Y.1980); *D.C. Leathers, Inc. v. Gelmart Indus., Inc.,* 125 A.D.2d 738, 509 N.Y.S.2d 161, 163 (1986). Plaintiff's position, however, is untenable. First, U.C.C. § 1–201 does not require a written notice. *See* 1 R. Anderson, Uniform Commercial Code § 1–201:128 (3d ed. 1981). Second, as we have seen, what constitutes reasonable notice depends on the circumstances of each case and is generally a question of fact. *Sherkate,* 701 F.2d at 1051. Here, a number of factors compellingly lead the court to conclude Texpor had adequate notice: among them defendants' expert's uncontradicted testimony that in all his years in the apparel industry he had never given written notice of defects. Finally, the cases cited by plaintiff are misplaced. In *Prompt,* the court held that oral notice was insufficient as a matter of law where the *contract itself specified that notice of an alleged defect must be given in writing upon discovery.* 492 F.Supp. at 347 (emphasis added). In *D.C. Leathers,* the court did not require written notice as a requisite to recovery. The court merely stated that where rejection occurred within one month after receipt of the goods and such rejection occurred in compliance with the reasonable practices of the industry, evidence of letters indicating there were defects in the goods would help support a finding that the buyer had given reasonable notice to the seller.

In the present situation, while evidence of letter from Oxford to Texpor would certainly buttress a determination that Texpor received adequate notification of the defects, nevertheless lack of such letter does not in any way detract from the certitude of the court's finding. The evidence at trial unmistakably supports the conclusion that Oxford acted within a reasonable time in notifying Texpor of the defects in the goods. The evidence also amply demonstrates that Texpor simply did not respond to such notice.

38. Continuing, plaintiff argues that the letter dated March 10, 1987 to TCB, *see* Court Exhibit 1, in which Texpor informed TCB of its intention to pursue its legal remedies against TCB if payment under the letter of credit was withheld, constituted a sufficient response to Oxford that any further communications between the parties should be had by counsel. Thus, insists plaintiff, Oxford could have informed plaintiff's attorney of any rejection or revocation of acceptance by Oxford. Instead, plaintiff maintains Oxford failed to give notice to Texpor that the goods were unacceptable until it filed its answer and counterclaim one year later. Such belated action on the part of Oxford, plaintiff claims, dissipates the effect that any prior notice may have had. *Sherkate,* 531 F.Supp. at 1059.

Plaintiff's reasoning is fallacious. Any communication between Texpor and TCB in no way imputes knowledge of any such communication to Oxford. Under U.C.C. § 5–109, the issuer of a letter of credit, unless otherwise agreed, is not a guarantor for performance of the underlying contract between the parties. Indeed, it is "the customer [who] by entering the underlying transaction has assumed the risks inherent in it...." *Id.* Official Comment, Note 1. Since Oxford's relation to Texpor on the underlying contract is independent of Texpor's relation to TCB regarding the letter of credit, *see, e.g., Marino Indust. Corp. v. Chase Manhattan Bank, N.A.,* 686 F.2d

---

Where the defect in a tender is one which could have been cured by the seller, a buyer who merely rejects the delivery without stating his objections to it is probably acting in commercial bad faith and seeking to get out of a deal which has become unprofitable.

Clearly, this is not the situation with Oxford, which held confirmed customer orders in excess of $100,000 and would assuredly lose substantial profits if it rejected the goods.

112, 115 (2d Cir.1982), any notice sent to TCB concerning the letter of credit is insufficient to serve as notice to Oxford of Texpor's intention to negotiate in good faith.

Simply stated, if Texpor was seeking to negotiate, why did not Texpor send a letter to Oxford? Plaintiff's explanation that such communication was against advice of counsel is absurd. Even assuming Taxier was later advised by his attorney against communicating with Oxford, it is obvious that Texpor had previously avoided communicating with anyone at Oxford concerning either the first or second shipments. The facts cannot be disputed. Both Baird and Hilton repeatedly called Texpor's New York office. Moreover, Taxier closed Texpor's New York office and Taxier changed his home telephone number, making it impossible for anyone at Oxford to reach him.

Under the Code, notice received for a particular transaction is effective from the time it is brought to the attention of the individual conducting the transaction, or in any event, from the time it would have been brought to his attention had he or the organization *exercised due diligence.* U.C.C. § 1–201(27) (emphasis added). "An organization exercises due diligence if it maintains reasonable routines for communicating significant information to the person conducting the transaction...." *Id.* In the current situation, Taxier certainly cannot validly claim to have exercised due diligence with respect to the notice given to Texpor. Indisputably, Taxier made no attempt whatever to contact Oxford regarding the second shipment, and in fact deliberately avoided attempts by persons at Oxford to contact him. A letter sent by Texpor's attorneys to the bank attempting to collect on the letter of credit simply does not constitute sufficient response to Oxford to negate Oxford's rightful rejection of the goods.

■■■ 39. Oxford's remedies for rightful rejection are governed by U.C.C. § 2–711 which reads in part:

(1) Where the seller fails to make delivery ... or the buyer rightfully rejects ... then with respect to any goods involved, and with respect to the whole if the breach goes to the whole contract (Section 2–612) [10] the buyer may cancel and ... may in addition to recovering so much of the price as has been paid

\*   \*   \*   \*   \*   \*

(b) recover damages for non-delivery as provided in this Article (Section 2–713).

\*   \*   \*   \*   \*   \*

(3) On rightful rejection ... a buyer has a security interest in goods in his possession or control for any payments made on their price and any expenses reasonably incurred in their inspection, receipt, transportation, care and custody and may hold such goods and resell them in like manner as an aggrieved seller (Section 2–706).

Consequently, Oxford is entitled to (1) recover $61,036.40 it paid for the first shipment; (2) cancel the order for the second shipment and be excused from paying $36,-612; (3) recover consequential damages as provided by § 2–715. In addition, Oxford is entitled to resell the goods but may not keep any profit from the resale. U.C.C. § 2–706(6); *see also* § 2–711 Official Comment Note 2. Accordingly, Oxford's compensatory damage award will be reduced by $53,199.75, the total amount Oxford received on the resale of the first and second shipments.

*Oxford's Counterclaim*

■■■ 40. Oxford's consequential damages include "any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise[.]" U.C.C. § 2–715(2)(a).

Oxford presented undisputed proof of confirmed customer orders. Moreover, the evidence manifestly demonstrates that Tax-

10. The remaining purchase orders, Nos. 10876, 10877 and 10880, were subsequently cancelled and are not part of the present action. For purposes of this action, the whole contract consists of purchase orders Nos. 10882 and 10881.

ier was aware these goods were intended for resale to quality department stores. Not only were Saks labels sewn directly onto many of the shirts in the first shipment, but Oxford had confirmed all of its customer orders before Texpor even commenced production in Portugal. Additionally, Taxier knew that timely delivery of the goods was important to Oxford: these goods were part of the Robert Stock line of clothing which was intended to be part of a spring collection. The purchase orders indicate the original delivery date for the goods was December 20, 1986 for the first shipment and January 15, 1987 for the second shipment. PX 1–2. These dates were extended four times by Oxford because Texpor did not meet its production deadline. Baird testified that the goods for the first shipment came in "right under the gun." DX R at 54–55.

The second shipment arrived late. Under the facts and circumstances, Oxford did everything it reasonably could concerning delivery and resale of the goods. The sweatshirts were not fungible; they were a special order, part of a line of clothing Oxford was attempting to develop. Because the goods in both shipments were non-conforming; because the goods from the first shipment were delivered very close to Oxford's commercial deadline; and because the goods from the second shipment were delivered late, Oxford could not possibly cover or in any way recoup its loss. As a reputable dealer in the apparel industry, Oxford would not and could not pass on unacceptable merchandise to its customers. Hence, Oxford took the next best practicable business approach: Oxford held the goods until it received a commercially reasonable offer and sold them in bulk as irregulars. In point of fact, Oxford refused to sell the goods at $2 per shirt and delayed until it received an offer from Marshalls for $4.75 to $5.00 per shirt.

As a result of the foregoing, Oxford is entitled to lost profits from the confirmed customer orders in the amount of $111,-112.78. *Harbor Hill Lithographing Corp. v. Dittler Bros., Inc.,* 76 Misc.2d 145, 348 N.Y.S.2d 920, 923 (1973). Oxford further requests an additional $52,153.17 for lost profits on potential customer orders. However, such profits are speculative and no basis exists for computing the amount of damages; hence, Oxford is not entitled to such potential damages. *Id.* 348 N.Y.S.2d at 924.

### The Letter of Credit

41. Finally, the court addresses plaintiff's contention that TCB improperly refused to honor the letter of credit when Texpor presented the required documents.[11] Plaintiff, citing *Flagship Cruises, Ltd. v. New England Merchants National Bank of Boston,* 569 F.2d 699, 705 (1st Cir.1978), *cited in Kelly v. Westroads Banks,* 840 F.2d 554, 560 (8th Cir.1988), contends that a variance between the documents required by the bank and the documents submitted to the bank is not fatal if there is no possibility the documents could mislead the issuing bank to its detriment. Continuing, plaintiff maintains that the documents presented more than substantially comply with the terms of the letter of credit, and that the missing room number on the address and the misdescription of the purchase order on the invoice are not material defects and could not possibly mislead the issuing bank. *See* Plaintiff's Post Trial Memorandum of Law at 14–15.

The issue presented is whether Texpor's demand for payment from TCB was in compliance with conditions specified in the letter of credit. The weight of authority in this jurisdiction and the prevailing view in New York is that an issuing bank is normally obligated to honor the beneficiary's request for payment only when the documents presented are in strict compliance with the letter of credit. *Banque Paribas v. Hamilton Industr. Int'l, Inc.,* 767 F.2d 380, 384 (7th Cir.1985); *Beyene v. Irving Trust Co.,* 762 F.2d 4, 6 (2d

---

11. U.C.C. § 5–114(1) reads in pertinent part:
An issuer must honor a draft or demand for payment which complies with the terms of the relevant credit regardless of whether the goods or documents conform to the underlying contract for sale or other contract between the customer and the beneficiary.

Cir.1985); *Voest–Alpine Int'l Corp. v. Chase Manhattan Bank, N.A.*, 707 F.2d 680, 682 (2d Cir.1983); *Marino Indus. v. Chase Manhattan Bank, N.A.*, 686 F.2d at 114; *Crist v. J. Henry Schroder Bank and Trust Co.*, 693 F.Supp. 1429, 1433 (S.D.N.Y.1988); *Bank of Cochin Ltd. v. Manufacturers Hanover Trust Co.*, 612 F.Supp. 1533, 1537–38 (S.D.N.Y.1985) *aff'd*, 808 F.2d 209 (2d Cir.1986); *Barclay Knitwear, Inc. v. Kingswear Enterprises, Ltd.*, 141 A.D.2d 241, 533 N.Y.S.2d 724, 729 (1988); *Eximetals Corp. v. Guimares, S.A.*, 73 A.D.2d 526, 422 N.Y.S.2d 684 (1979), *aff'd*, 51 N.Y.2d 865, 433 N.Y.S.2d 1019, 414 N.E.2d 399 (1980). As the oft-cited quotation reminds us, where documents are required "[t]here is no room for documents which are almost the same, or which will do just as well." *See* H. Harfield, *Bank Credits and Acceptances* 73 (5th ed. 1974) (quoting *Equitable Trust Co. v. Dawson Partners*, [1927] 27 Lloyds List 49, 52), *cited with approval in Voest–Alpine*, 707 F.2d at 683; *Bank of Cochin*, 612 F.Supp. at 1537.

Plaintiff maintains "[i]t is clear beyond peradventure that the real reason behind dishonorment [sic] was ... defendant Oxford's request to TCB not to pay [Texpor]." Plaintiff's Post–Trial Memorandum of Law at 14. This is evident, plaintiff argues, because TCB honored the request for payment on the first shipment but when presented with identical documents refused to honor the request for payment on the second shipment. The evidence, however, reveals that it was TCB which informed Oxford about discrepancies in the documents regarding the letter of credit. Tr. 175. Moreover, as defendants aptly point up, plaintiff's argument has no legal effect. Merely because Oxford in one instance chose to waive discrepancies in the letter of credit, does not require that it do so again, nor does it authorize the issuing bank to similarly waive such discrepancies. *See Far Eastern Textile v. City Nat. Bank & Trust*, 430 F.Supp. 193, 198 (S.D.Ohio 1977).

In the instant case, the documents presented do not strictly conform to the requirements of the letter of credit. Among the discrepancies are a missing room number, a misdescription of the address on the invoice and an omission of the word "Oxford" as it appears on the letter of credit evidencing shipment of purchase order No. 10881. Unfortunately for plaintiff, these discrepancies, taken as a whole, are not trivial or "microscopic." Any exception to the strict compliance standard for beneficiaries suing the issuing bank must leave " 'no possibility that the documents could mislead the paying bank to its detriment.' " *Bank of Cochin*, 612 F.Supp. at 1541 (quoting *Flagship*, 569 F.2d at 705). As noted in *Bank of Cochin*, "the Second Circuit affirmed the dishonor of a letter of credit on the sole ground that the misspelling of Mohammed Sofan as Mohammed Soran on the bill of lading constituted a material discrepancy." *Id.* (citing *Irving Trust*, 762 F.2d at 5–6). In the current situation, the discrepancies amount to considerably more than a single misspelling. Consequently, TCB properly refused to honor Texpor's request for payment under the letter of credit.

## CONCLUSION

Texpor delivered non-conforming goods to Oxford, which Oxford rightfully rejected. Oxford gave seasonable notice of the non-conformity and rejection to Texpor. The latter, however, deliberately failed to respond to Oxford's communications and deliberately became "incommunicado," thereby placing Oxford in an unreasonable position.

As a result, Oxford is entitled to (1) recover $61,036.40 paid for the first shipment minus $53,199.75, the amount it recovered on the resale of the goods for the first and second shipments, an amount totaling $7,836.65; (2) cancel the order for the second shipment and be excused from paying $36,612; (3) receive consequential damages in the amount of $111,112.78 for lost profits on confirmed customer orders that were cancelled as a direct result of Texpor's failure to deliver conforming goods.

TCB properly refused to honor a request for payment under a letter of credit when the documents presented did not strictly conform to the requirements of the letter of credit.

The foregoing constitutes the court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a).

The clerk of the court is directed to enter judgment in favor of defendants for $118,949.43.